# DR. B. F. SANDERS v. HAZEL B. SANDERS — 288 S. W. (2d) 473.

Eastern Section. March 15, 1955.

Petition for Certiorari denied by Supreme Court August 2, 1955.

Ladd & Qualls, Harriman, for complainant.

McCluen & Cooley, Rockwood, for defendant.

HOWARD, J. This is a suit between husband and wife while still living together, involving the validity of an antenuptial contract.

Referring to the parties as they appeared below the complainant, Dr. B. F. Sanders, a dentist, filed the original bill herein against his wife, Hazel B. Sanders, alleging that they were last married October 28, 1951, previous to which they had been twice married and divorced.

The bill alleges as a condition to their remarriage in October 1951, the defendant required the complainant to execute the following contract:

"This instrument, made and entered into on this the 26th day of October, 1951, by and between Dr.

B. F. Sanders, hereinafter called the first party, and Hazel Burnette, hereinafter called the second party.

Witnesseth

"WHEREAS, The parties to this instrument are contemplating marriage and establishing a home together, and

"WHEREAS, Each has property of their own and upon their marriage desire to pool their resources for the benefit of each other, and

"WHEREAS, In order to avoid any future conflict as to their rights and interests in said property this instrument is made.

"*Now Therefore,* For and in consideration of the mutual benefits to be derived therefrom the parties agree and bind themselves as follows:

"1. The parties hereby agree to enter into the marriage relation and live together as husband and wife.

"2. On or before the date of marriage all property belonging to the parties, including bonds, bank accounts and realty, shall be re-issued, re-deposited and deeds drawn so that each party shall be the joint owner, with right of survivorship, of all of the property at present owned and held by the parties separately and individually.

"3. Each party obligates himself to purchase and hold all property, present and future, jointly with the other party and agrees to execute any instrument necessary to convey, sell, or encumber any property, real or personal, when it is to the best interest of both parties that same be conveyed, sold, or encumbered.

"4. At the death of either party the property belonging to both shall be and become the absolute property of the other, free from claims of any and all other persons. To make effective and certain this section of the agreement a joint will of the parties is made and is placed in their safety deposit box in the First National Bank in the City of Harriman, Tennessee.

"5. Should either party file a divorce against the other, then the party so filing shall by such filing forfeit to the other all right, title, and interest in all the property, real, personal or mixed, jointly held and owned by them.

"The parties agree that the original of this instrument shall be deposited in escrow with J. E. Pearman to be held by him. The agreement cannot be revoked except by written consent of both parties and the holder in escrow shall not deliver the original to any one except a court of competent jurisdiction or to the parties of this instrument upon their mutual demand for the surrender thereof. The instrument is made in triplicate with each party hereto retaining a copy thereof, but the copy shall not be used in evidence or to serve any legal purpose whatsoever if the original is available.

"In Witness Whereof the parties hereto have set their signatures on the day and date first above written."

The bill alleges as a further condition of the remarriage defendant required complainant to execute a joint will with her, by which each gave to the other all joint property except that if defendant died first, the estate in the hand of complainant was charged with the payment

to defendant's parents, if living, $1,000 per year for ten years. Upon the death of the survivor the estate to be equally divided between heirs of complainant and parents of defendant. The bill gives notice that complainant revokes and declares void the will.

The bill also alleges that the antenuptial contract is void "being against public policy." As reasons for his desire to cancel the contract and revoke the will, he charges that defendant "in recent months has conceived the idea that she can treat the complainant as she pleases and that he must endure it." As examples of alleged mistreatment complainant charges that defendant refused to sign joint income tax return and refers to his grandson as "a little Bastard."

The bill further alleges: "Your complainant avers that he loves his wife, that he expects to live with her if she will permit him to do so, and will treat him right, and he expects to leave her a substantial amount of property and money on his death, but he would like to have the privilege of giving her something rather than being under a contract to give her all."

The bill prays that the contract and will be cancelled and revoked, or in the alternative that the contract be declared void as a violation of public policy.

Defendant filed an answer and cross-bill averring that she and complainant were first married on December 24, 1938 and first divorced in February 1949. They remarried in April 1949; that complainant filed a divorce action against her in July 1949, which was dismissed in December 1949; that complainant filed a second divorce action against her March 23, 1951, to which she filed answer and cross-bill, and she was granted a second divorce on June 4, 1951 and remarried in October 1951.

The answer admits the execution of the foregoing contract, and avers that it was proposed by complainant to induce her consent to a remarriage; that he had it prepared by his attorneys and it was "made in consideration of and prior to their third marriage." Defendant avers that she has complied with her part of the contract, and that complainant has refused to comply therewith, and she denied that the contract is void. She prayed for specific performance and for injunction restraining complainant from transferring or incumbering any of his property to defeat the instrument.

The answer denies all wrongdoing alleged against defendant in the original bill.

On the issues thus made, oral hearing was had before the Chancellor who filed a carefully prepared opinion holding that the whole contract was void by reason of provision 5, which was against public policy and could not be deleted from other parts of the contract.

Accordingly a decree was entered dismissing both original and cross-bill and taxing complainant with all costs.

From the decree both parties have prayed appeals and have assigned errors, the complainant insisting that the Chancellor erred (1) in refusing to cancel the contract after having found it to be void, and (2) in refusing to enter a declaratory decree.

The defendant assigned errors insisting that the Chancellor erred (1) in holding the antenuptial contract against public policy and void because of provision 5; (2) in holding the contract was not severable and paragraph 5 could not be deleted; (3) in refusing to grant specific performance as prayed; (4) in refusing to enjoin the complainant from revoking his will; and (5) in refus-

ing to allow defendant's attorneys a reasonable fee for their services.

Inasmuch as assignments 1 and 2 present substantially the same questions, they will be considered together.

First: Is paragraph 5 of the antenuptial contract against public policy and void? This paragraph reads as follows:

"5. Should either party file a divorce against the other, then the party so filing shall by such filing forfeit to the other all right, title, and interest in all the property, real, personal or mixed, jointly held and owned by them."

Regarding paragraph 5, the Chancellor's opinion correctly states:

"This provision of the contract is not a provision in restraint of marriage, as has been the basis of so many suits, and which have uniformly been held invalid. The question is one of forfeiture."

Then the Chancellor quoted from 12 Am. Jur., the following:

"A person cannot contract beforehand under penalty of forfeiture that he will not litigate claims that may hereafter arise. As it is the policy of the law to furnish everyone with legal remedies for any injuries received, an agreement which essentially imposes a penalty for seeking such legal remedy in contrary to that policy." Sec. 181, p. 683.

Other authorities are also quoted, from all of which the Chancellor concludes that provision 5 of the contract is contrary to public policy and void.

"By the great weight of authority, a bona fide agreement by one interested in the estate of a testator, to refrain from contesting the will, is valid. It

is not void as against public policy, since it lessens litigation; and the forbearance to sue, being a detriment to the promisee, is a sufficient consideration to support the promise." Annotation 55 A. L. R. 812.

Among the numerous cases referred to in the above Annotation is the case of Gore v. Howard, 94 Tenn. 577, 30 S. W. 730, in which a will contest instituted by a daughter was dismissed on the ground that she had entered into a valid contract with her father during his life to accept certain advancements in full satisfaction of her interest in his estate. It was insisted on behalf of the daughter that the contract was against public policy and void, but the Supreme Court held otherwise, holding that the contestant was estopped from contesting the will while retaining the benefits received by the contract.

In Tate v. Camp, 147 Tenn. 137, 245 S. W. 839, 26 A. L. R. 755, it was held that provision in a will providing for forfeiture of bequest of legatee who contested the will was not void against public policy, the provision in question providing as follows:

" '* * * if any person or persons to whom I have herein made bequests shall enter any contest of this will, upon any ground whatsoever, such person or persons shall forfeit and lose the provision made for them, and what they would have taken shall fall back to my estate and pass under the residuary clause of this will.' "

In the body of the opinion, the Court said:

"Is a forfeiture provision, of the character here involved, void as against public policy? The decisions are practically unanimous in holding such provisions valid. Thompson v. Gaut, 14 Lea [310], 313; Williams

v. Williams, 15 Lea 438; 40 Cyc. 1705; Redfield on Wills, 679; 2 Jarman on Wills, 682''.

The Court then reviewed numerous cases bearing upon the validity of such forfeiture provision, finally holding '' 'Where the contest has not been made in good faith, and upon probable cause and reasonable justification, the forfeiture should be given full operative effect. Where the contrary appears, the legatee ought not to forfeit his legacy.' '' Then the Court held that the contest having been instituted in good faith, the contestant did not forfeit his bequest under the forfeiture provision of the will.

In Stansell v. Roach, 147 Tenn. 183, 246 S. W. 520, 522, 29 A. L. R. 143, the complainant sued to recover compensation for services in lobbying with members of Congress for an appropriation to pay for work done on levies along the Mississippi River. The suit was defended on the ground that a lobbying contract was against public policy and void. There the Court held that a lobbying contract was not void unless it appeared that the contract contemplated corruption of public officials or other wrongful acts, the Court saying:

'' 'Courts will not declare contracts void on grounds of public policy except in cases free from doubt; a prejudice to the public interest must clearly appear before a court is justified in pronouncing a contract void on that account.' ''

The general rule applicable to antenuptial contracts between prospective spouses is stated in 26 Am. Jur., as follows:

''By such a settlement or agreement the parties may define their property rights in property existing or after-acquired, and they may vary substantially

property rights which would otherwise arise on their marriage by operation of law, superseding, in a sense, statutes on that subject. * * * Such an agreement or settlement is favored by public policy as conducive to the welfare of the parties and the best purpose of the marriage relationship, and to prevent strife, secure peace, adjust rights, and settle the question of marital rights in property, thus tending to remove one of the frequent causes of family disputes—contentions about property and especially allowances to the wife. Indeed, it has been observed that such marriage settlements or agreements are matters of history and have been upheld and sustained from the earliest times.'' Sec. 275, pp. 882, 883.

''An antenuptial settlement or agreement to the extent that it is executory must be supported by consideration, but marriage itself is consideration for such a settlement or agreement, and indeed, it is said to be perhaps the most valuable and highly respected consideration of the law in this as well as other cases. * * * Marriage, however, is distinguishable from other valuable considerations in that it is not capable of being reduced to a value which can be expressed in dollars and cents, and also in that, after the marriage, *the status cannot be changed by setting it aside or by rescinding or canceling it, and hence the parties cannot be placed in status quo,* * * *'' Sec. 277, pp. 884, 885.

''An antenuptial settlement or agreement is to be construed in general according to principles applicable to the *construction of deeds and contracts* generally. Such a settlement or agreement, however,

since it is favored by public policy, is to be construed liberally to effect the intention of the parties, irrespective of the ordinary legal construction of words used therein and of externals and the form of the instrument; indeed, form will be totally disregarded to get at the substance of the intention of the parties, and the agreement or settlement will not be held *invalid for technical or trifling reasons.*

\* \* \*

''Although an antenuptial settlement or agreement is to be construed according to the principle that the intention of the parties is to be given effect, in so far as it can be ascertained as above discussed, it is, nevertheless, to be interpreted according to its words. No contract is to be construed in conformity to the mere unexpressed expectation of the parties to it. Hope of the one or apprehension of the other not written into the agreement constitutes no part of its obligation. There are, however, certain implications which arise out of the nature of the transaction, where a man and woman, in contemplation of marriage, attempt to settle by contract their respective property rights in the estate of the first to decease. The participants in an antenuptial contract do not stand at arm's length with reference to each other. Their relation is one of highest trust and confidence. It demands the utmost good faith on the part of each. This is a necessary concomitant of the execution of such an instrument, and the performance of its stipulations must also be in the same spirit.'' Sec. 280, pp. 886, 887.

''An antenuptial agreement of one spouse to make a certain testamentary disposition in favor of the other spouse or not to take against his or her will is

binding and enforceable." Sec. 283, pp. 890, 891. (Emphasis supplied.)

In the instant case, the complainant obtained not only an interest in the defendant's property deposited to their joint account, but also the marriage, which was the primary consideration for the contract. As to the marriage, the status quo cannot be restored.

Under the circumstances it would seem that the effect of paragraph 5 of the contract should be determined by whether or not a subsequent divorce suit is instituted by either party in good faith and upon reasonable grounds. This would be a question of the construction of that provision rather than its validity.

The reasoning for the Chancellor holding that the contract in suit violated public policy is stated in his opinion, as follows:

"Here, we have in clause five of the contract a clause which would cause the party filing a divorce action to forfeit all of his right, title and interest in the joint property of parties. While it is desirable that the parties not seek a divorce, certainly neither husband nor wife should be forced to live with the other regardless of the conduct of the other party. For fear of a great financial loss, great hardship could be imposed upon the party to such contract. He or she might be forced to endure abuse, insult, embarrassment or the grossest sort of cruel and inhuman treatment. To permit such an agreement to stand would impose a penalty for seeking a legal remedy for an impossible situation. I think it is definitely contrary to public policy."

If the forfeiture clause in the contract could have the effect stated, we would agree that same contravened

public policy; but, with greatest respect for the learned Chancellor, we are constrained to hold otherwise for these reasons:

■ As held by the Chancellor, it is premature to declare fully the rights of the parties under this contract at this time; yet it is necessary to construe and determine the effect of the contract in order to determine whether it violates the public policy rule. To do this, it is proper to consider the purposes of the contract, and the situation of the parties when it was made. Lippman v. Boals, 79 Tenn. 489.

The parties at the time the contract was executed were contemplating remarriage. Their previous married life had been unusually turbulent. Each had filed two divorce actions against the other. Each was possessed of valuable property which they were agreeing to pool into an estate by entireties. In that situation it was reasonable that each should want to avoid future divorce action and stipulate against it, and the forfeiture provision apparently seemed to them at the time as a good means to the end. There is no intimation in the record that the contract was not executed in good faith by the parties in the belief that it was valid in all its provisions. Should a contract made under those conditions be declared void because of its forfeiture provision?

■■ It is the general rule in this State that the law favors the protection and enforcement of rights. Allen v. Effler, 144 Tenn. 685, 235 S. W. 67, and does not favor forfeitures. Wells v. McCanless, 184 Tenn. 293, 198 S. W. (2d) 641, 643.

In Wells v. McCanless, supra, it is held that forfeitures must be strictly construed and will be enforced " 'only when within both letter and spirit of the law.' "

While the above is the general rule, forfeitures are not illegal and will be generally enforced unless justice and equity is violated. For example, forfeiture for failure to pay rent is put in most leases of real estate, and uniformly enforced.

■ As stated in Stansell v. Roach, supra, ''Courts will not declare contracts void on grounds of policy except in cases free from doubt, and a prejudice to the public interest must clearly appear.''

In Home Beneficial Ass'n v. White, 180 Tenn. 585, 177 S. W. (2d) 545, 546, the Court said:

''The public policy of the State is to be found in its Constitution, its laws, its judicial decisions and the applicable rules of common law. 'Public policy' is practically synonymous with 'public good,' and unless the private contract is in terms of such a character as to tend to harm or injure the public good, public interest or public welfare, or to violate the letter or the spirit of the Constitution, laws, common and statutory, or judicial decisions of the State, it is not violative of public policy nor void on that account.''

In the instant case, the able Chancellor states that his research, as well as the research of counsel, failed to find any case in point, holding the contract against public policy. Hence, the Chancellor apparently reasoned from a supposed analogy to that line of cases holding that a trust deed covering property consumable in the use with other property was void in its entirety.

We are of the opinion that line of cases is not applicable here because in those cases, the illegal matter was part of the consideration for the contract.

Here the consideration for the contract was the con-

summation of the contemplated marriage and the pooling of the property of the parties. The forfeiture provision was no part of the consideration, and only imposes a penalty in the event either party should seek a divorce. We think that the provision is more nearly analogous to the forfeiture provision sometimes put in wills which, as previously pointed out, are uniformly held not to violate public policy.

Nor does the provision contract away the right of either party to sue for divorce. It only imposes an option to sue for divorce and recover such property as the Court may award if successful. If the divorce suit is prosecuted in good faith and upon reasonable grounds, although not successful, the property rights stipulated in the contract will not be forfeited. If, however, the divorce suit is not prosecuted in good faith and upon reasonable grounds, the party filing such suit will forfeit his or her right to the property.

For these reasons we are constrained to hold the learned Chancellor erred in decreeing that the contract violated public policy and is void. Therefore, the defendant's first assignment of error will be sustained and complainant's first assignment is overruled. That makes a consideration of the defendant's second assignment unnecessary.

The defendant's third assignment presents for consideration her right to specific performance of the contract.

Before considering this assignment we make the observation that the record shows that the frequent marital disputes between the parties seem to have resulted mainly from disagreements over material matters that persons of mature years usually work out themselves understandingly without having to resort to ill advised litigation.

In the future each of the parties concerned should be more considerate, tolerant and forbearing and less demanding, remembering that the marital relation should be one of sympathy rather than one of conquest.

The right to specific performance in any particular case is governed by the ordinary principles of equity, and the granting or refusing of a decree lies within the discretion of the Chancellor; and a litigant is not entitled to have such decree as a matter of right. Moss Tie Co. v. Hill, 191 Tenn. 582, 235 S. W. (2d) 587, 588.

Specific performance will not be decreed where the situation of the parties is such that it ''would be harsh, inequitable, oppressive, or result in an unconscionable advantage''. Moss Tie Co. v. Hill, supra; Caldwell v. Virginia Fire & Marine Ins. Co., 124 Tenn. 593, 139 S. W. 698.

On the other hand when the contract is valid and no injustice will result, the Courts are bound to enforce it. Gibson's Suits in Chancery, 4th Ed., Sec. 949, p. 774.

The cross-bill charges and the proof shows that complainant owns certain real estate which has not been conveyed into their joint names. No reason appears why that should not have been done. The defendant has already deposited her money and bonds to the amount of $13,900, and complainant should convey the real estate as provided in the contract. The contract provides that such property may be sold or encumbered by the signature of both parties when to their mutual interest. Hence, no undue hardship will result from such conveyance. To this extent the defendant's third assignment will be sustained.

It is the right of both parties for the wills executed

pursuant to the contract to remain unrevoked except by mutual agreement, and a decree will be entered to that effect.

By the fifth assignment the defendant seeks a decree against complainant for a reasonable fee for her attorneys.

In divorce proceedings, attorneys' fees are allowed in favor of the wife against the husband as part of the expenses incident to the cause. Shy v. Shy, 54 Tenn. 125; Winslow v. Winslow, 133 Tenn. 663, 182 S. W. 241.

In this case, we think the ends of justice will be met by requiring the parties to sign and deliver a check upon their joint bank account to pay defendant's attorneys a reasonable fee when agreed upon or otherwise ascertained by proper reference.

The cost of the cause will be paid by complainant, as adjudged by the Chancellor.

As indicated, the decree of the Chancellor will be reversed, and a decree will be entered in this Court in accordance with this opinion. Thereafter the cause will be remanded to the Chancery Court of Roane County for such orders as may be necessary for the enforcement of the decree.

McAmis, P. J., (Eastern Section) concurs.

Hale, J., did not participate.