ROBERT RING, Appellant, v. LOUIS JEHL, Ila Jehl, Irene Jehl, and Jehl Cooperage Co., Inc., Appellees. No. 2.
—421 S.W.(2d) 375.

Western Section. May 25, 1967.

Certiorari Denied by Supreme Court November 20, 1967.

Don Owens, Memphis, for appellant.

Thomas F. Turley, Jr., Memphis, for appellees.

BEJACH, J. In this cause Robert Ring appeals from a decree of the Chancery Court of Shelby County, Tennessee dismissing his bill against Louis Jehl, Ila Jehl, Irene Jehl and Jehl Cooperage Co., Inc., which bill sought specific performance of an employment contract. Said contract required, under certain circumstances, the repurchase of stock by defendants, which stock complainant had purchased in the Jehl Cooperage Co., Inc.

The issues presented are, first, whether or not the defendants are obligated to repurchase complainant's stock; and second, if so, the date as of which the value of the stock is to be fixed for repurchase. In this opinion, the parties will be styled, as in the lower court, complainant and defendants, or called by their respective names.

On September 13, 1958, the complainant, as first party, and the defendants, as second parties, entered into a contract of employment for which complainant was to be paid $9,500 per year, payable in monthly installments. The contract permitted complainant to purchase stock in the Jehl Cooperage Co., Inc., which is a closely held corporation, most of the stock of which is owned by the

Jehl family. The contract provided that, under certain circumstances, the individual defendants should be obligated to repurchase such stock or have the corporation purchase same and retire it. The contract of employment was for a term of one year, beginning October 1, 1958 and ending September 30, 1959, but it provided that it should be automatically renewed from year to year unless one or the other of the parties thereto notified the other in writing on or before the first day of October of any year. Such provision is made in Article V of the contract of employment, and that Article makes no provision or requirement for repurchase of complainant's stock. Article VI of the contract of employment, however, provides, "Although it is the express intention of the parties that this agreement shall be of one year in duration, it is mutually agreed that the covenants herein contained may be terminated in advance of the end of the term hereof or of any annual period upon the happening of any one of the following events":

(1) Death of First Party (complainant), (2) Permanent total disability of First Party, (3) Termination for cause.

Paragraph (3) of Article VI provides: "Gross and intentional failure in performance of any of the terms or conditions of this Agreement by the First Party or by Second Parties, shall be deemed good cause for termination by the party or parties wronged. In said event, notice of intention to terminate shall be given in the manner stated for termination at the expiration of the term hereof but the employment herewith created shall continue for thirty calendar days from the date of notice, unless a shorter period shall be agreed upon. In said event, it is agreed that First Party shall sell and Second Parties shall buy or cause to be bought by the corporation

the capital stock of the corporation of which First Party shall be owner of record on the day of said notice, at its value upon the books of the corporation, exclusive of good will, on the last day of the preceding business month."

Complainant's employment under said contract continued, from year to year, until 1965. During the latter part of 1965, complainant having, according to his own deposition, decided to go into business "on his own or for himself" notified Louis Jehl, president of Jehl Cooperage Co., about the first or second day of September, 1965, that he (complainant) was terminating his employment. Such notice was not in writing, but was accepted and relied upon by the defendants. Complainant did, however, agree to stay on for a brief or indefinite period of time for the purpose of training his successor. Under such agreement, he did stay on beyond October 1, 1965.

Notwithstanding the fact that defendants did not consider themselves obligated to repurchase complainant's stock in the Jehl Cooperage Co., they did negotiate with him concerning the repurchase of same; but they were unable to agree on a purchase price. The principal point of disagreement seems to have been that defendants wished to figure the value of complainant's stock as of March 31, 1965, the end of the company's fiscal year whereas, complainant insisted on valuing it as of September 30, 1965. On October 7, 1965, while such negotiations were still pending, complainant served written notice on defendants to the effect that he (complainant) was terminating his employment for cause. Such notice did not, however, specify the nature of the cause of which he was complaining. On October 9, 1965, defendants acknowl-

edged receipt of complainant's written notice, and on October 13, 1965, they discharged him, giving him a check for services up to October 15, 1965. On November 1, 1965, defendants withdrew their previous offer of $52,436.08, which they had made to complainant for his stock.

Sometime during the month of September, 1965, complainant had signed a contract to purchase the Trobaugh Electric Co. as of August 31, 1965, which contract was finalized October 14, 1965.

The statement of this case is in accord with the facts as found by the Chancellor, and we think the clear preponderance of the evidence sustains his finding of facts. Among other findings made by him was the finding of fact that the defendants waived written notice as provided for in the contract of employment. Based on that finding of fact, the Chancellor ruled that the termination of complainant's employment occurred pursuant to Article V of the contract of employment, and not under Article VI thereof. It followed from this ruling that, under Article V, defendants were not obligated to repurchase complainant's stock, but that they would have been so obligated if the termination of employment had occurred pursuant to paragraph (3) of Article VI, as is contended for by complainant. The Chancellor also ruled that even if complainant's employment had been terminated by complainant's written notice of October 7, 1965, in order to impose on defendants the obligation to repurchase his stock, it would have been necessary for complainant, in that notice, to have specified, and he be able to prove, what the causes were that induced him to terminate the employment. We concur in that ruling of the Chancellor. The notice did not specify any cause or causes, and complainant did not offer proof of any. On

the contrary, defendants proved that no such cause or causes existed. One of complainant's assignments of error complains of the admission of such proof.

The Chancellor dismissed complainant's bill, after which complainant excepted to the decree and perfected his appeal to the Court of Appeals.

As appellant, complainant has filed in this Court five assignments of error, which are as follows:

## "I.

The Court erred in dismissing the original bill of the complainant. This was error because the evidence preponderates against the decree of dismissal. The decree is against the law and facts.

## II.

The Chancellor erred in holding that the defendants could or did waive the requirement of written notice to terminate. This was error because the agreement expressly provides for written notice, said provision was made for the benefit of or in favor of the complainant as well as the defendants, and the defendants' actions with respect to negotiation with the complainant for repurchase of the stock is inconsistent with said holding.

## III.

The Chancellor erred in holding that the defendants are not obligated to repurchase complainant's stock. This is error because the complainant complied with the letter and intent of the agreement and the contract provides for the repurchase of the stock.

## IV.

The Chancellor erred in holding that in his written notice of termination for cause, the complainant was required to include therein and specify the nature and facts concerning his cause. This is error because the contract does not so provide. The only requirement is that written notice be given of intent to terminate for cause.

## V.

The Chancellor erred in admitting, over the objection of the complainant, evidence concerning the existence, nonexistence or sufficiency of cause on the part of the complainant. This was error because when the defendants terminated the complainant (sic) whether or not cause existed or the sufficiency of it became academic and moot.''

██ This cause comes to us under the provisions of Section 27-303 T.C.A. for trial de novo, with the presumption that the decree of the lower court is correct unless the preponderance of the evidence is otherwise. Not only does the evidence not preponderate against the Chancellor's decree, but, in our opinion, the clear preponderance supports the Chancellor's findings of fact and rulings thereon. On this aspect of the case, we cannot do better than quote from defendants' brief, as follows:

"Therefore, appellee would say first, that as to the *facts,* this appeal offers no effective challenge to the Chancellor's opinion (Tr. Vol. 1, pages 14, et seq) and the facts as so found are in the circumstances adequate predicate for the decree entered below, indeed on those facts the Chancellor could have entered no other.

But lest there be any misgivings on that score, indeed, in order that it will be apparent to the Court that the Chancellor, in dismissing complainant's bill at complainant's cost, actually took a very charitable view of complainant's efforts herein to take advantage of his own wrong, let us look briefly at the FACTS:

Though complainant does not therein say so in as many words, it seems plain from his original bill (tr 2) filed on November 18, 1965, that it was then complainant's view of this matter that as regards his employment with defendant Jehl Cooperage Company, Inc., nothing of any legal significance occurred in September, 1965, except what had happened each year since 1959, i. e., that his contract for full-time employment with defendant corporation was automatically renewed for another annual term, October 1, 1965, through September 30, 1966; that he (complainant) was, evidently, ready and willing to perform the obligations which he thereby undertook and would have done so but for some unspecified events which arose on or about that date which necessitated his giving on October 7, 1965, notice to terminate under the 'for cause' section of the agreement (Article 6, Section 3). (What those causes were, complainant does not say either in his original bill or in the notice of October 7, 1965.) The original bill then continues by saying that the complainant having terminated his employment by formal notice 'for cause' on October 7, 1965, defendants, on October 13, 1965,

'arbitrarily and without justification ————— discharged complainant',

But when complainant's deposition was taken in early December, 1965, it came out that complainant, having decided a month or so before to do so, notified defendants through defendant Louis Jehl, President of defendant Jehl Cooperage Company, Inc., on September 1 or 2, 1965, that he (complainant) was terminating his employment to go into business

'on his own or for himself'

but would stay awhile,

"possibly as long as two or three months',

to help train the new man; that defendants accepted, relied upon, and acted upon that notice, arranged that the new man (Bob Kapp) be hired to *replace* rather than to *work with* complainant, and in all respects. proceeded upon the assumption that complainant's employment beyond October 1, 1965, would be, as he himself describes it, 'indefinite' (see Ring's deposition, page 66); that complainant, who had been negotiating the deal since *before* he notified defendants that he was terminating his employment (see Ring's deposition, page 57), did in fact buy Trobaugh Electric Company as of August 31, 1965, the contract of sale having been signed in September, 1965, and the deal having been closed October 14, 1965; that beyond staying with defendant corporation for a short while, to 'break-in' the new man, Bob Kapp, *complainant had no intention of assuming the obligation which he would have undertaken had he renewed his contract for full-time employment with defendant corporation for another term, i. e. for the term October 1, 1965, through September 30, 1966,* and by making the deal to purchase Trobaugh Electric Company he made impossible his *performing the duties which he would have undertaken had he in*

*fact renewed his Contract for another year for full-time employment with defendant corporation;* that when he notified defendants on September 1 or 2, 1965, that he was terminating his employment, complainant made no mention of their buying his stock; *that that subject did not come up until later* and when it did discussion was NOT on the basis of their being *obligated* to buy it but rather on the basis of what would be a fair price, what the terms should be, et cetera, but that efforts to reach agreement about those matters ultimately proved futile.''

The facts having been found as contended for by defendants, rather than as contended for by complainant, it is apparent, that complainant has violated at least three equitable maxims, which are: ''He who seeks equity must do equity'', ''He who comes into equity must come with clean hands'', and, ''No one can take advantage of his own wrong''. See Gibson's Suits in Chancery (5th Ed.), secs. 48, 51, 60.

Not only must the right to specific performance in any particular case be governed by ordinary principles of equity, but, in every case the granting or withholding of specific performance is within the sound discretion of the Chancellor. As was said by Mr. Justice Burnett, now Chief Justice, in Moss Tie Co. v. Hill, 191 Tenn. 582, 586, 235 S.W.2d 587, 588:

''The right to specific performance in any particular case is governed by the ordinary principles of equity,

'Equity, in decreeing specific performance, requires not only that the contract be just and equitable in its provisions, but that the consequences of specific performance likewise be equitable and just. One of the

general rules formulated and followed is that this equitable relief will not be granted if, under the circumstances of the case, the result of the specific enforcement of the contract would be harsh, *inequitable,* oppressive, or result in an unconscionable advantage to the plaintiff, even though the complainant *has no intention of taking an unfair advantage,* and even though the contract may be valid and enforceable at law. In every case where a specific performance is asked, the question must be whether the exercise of the power of the court *is demanded to subserve the ends of justice,* and unless the court is *satisfied that it is right in every respect, it will refuse to interfere.'* (Italics ours). 49 Am.Jur. Section 58, page 72.

"The granting or refusing of a decree of specific performance lies within the sound discretion of the Chancellor under the facts appearing in the particular case. New River Lumber Co. v. Tenn. Railroad Co., 136 Tenn. 661, 191 S.W. 334. A litigant cannot have such a decree as a matter of right. Leathers v. Deloach, 140 Tenn. 259, 204 S.W. 633." Moss Tie Co. v. Hill et al., 191 Tenn. 586, 235 S.W.2d 588.

See also Sanders v. Sanders (1955), 40 Tenn.App. 20, 36, 288 S.W.2d 473 at page 480, 57 A.L.R.2d 932.

On this aspect of the case, we also quote from Am.Jur., as follows:

"The complainant coming into equity for specific performance must show not only that he has a valid legal enforceable contract, but also that he has complied with its terms by performing or offering to perform, on his part, the acts which form the consideration of the undertaking on the part of the defendant, or that he is

ready, able, and willing to perform his obligations under the contract, in their entirety, and to do whatever has been made a condition precedent on his part, or show a valid excuse for the nonperformance of the convenants incumbent upon him. * * *

The failure or inability or refusal to carry out the terms of the contract at the time when performance is due will ordinarily be grounds for refusing specific performance, since specific performance will not generally be decreed in favor of a party who has himself been in default, or who has willfully violated his part of the contract, whereby the defendant has been deprived of a substantial benefit under it. * * *'' 49 Am. Jur. Specific Performance, Sec. 40, pages 53, 54.

Am.Jur. also says:

''Courts of equity do not enforce specific performance of a contract where circumstances have arisn which make its performance inequitable, or, where there has been delay amounting to laches on the part of the plaintiff, and as a general rule will not grant a decree of specific performance in favor of a party who has himself once refused to perform the contract or has been guilty of such conduct as amounts to a refusal to perform it. The reason for the rule is that one who asks a court of equity to compel the specific performance of a contract must show that he has performed, or has been able and willing to perform all the essential terms of the contract devolving on him. The rule is based on the principle that he who seeks equity must do equity. A party cannot be permitted to violate his contract and wait until he sees that his bargain will be profitable, and then invoke the aid of a court of equity

to have it executed." 49 Am.Jur.—Specific Performance—Sec. 78, page 95

As stated above, we think the complainant in the instant case has violated several of the "Maxims of Equity", which are referred to in the above quoted authorities. This alone would justify the dismissal of his bill.

All of appellant's assignments of error will, therefore, be overruled; and the decree of the lower court dismissing complainant's bill will be affirmed.

The costs of the cause, both those incurred in the lower court, and those incident to the appeal, will be adjudged against appellant and the surety on the appeal bond.

Avery, P. J. (W.S.), and Carney, J., concur.