IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 2, 2004 Session

## MARILYNNE MACLEOD REED v. JOHN WILLIAM REED

**Direct Appeal from the Chancery Court for Rutherford County**
**No. 02-5606DR     Royce Taylor, Chancellor**

_____

**No. M2003-02428-COA-R3-CV - Filed December 30, 2004**

_____

This is a divorce case. Prior to their marriage, the parties entered into an antenuptial agreement, designed to keep separate all property brought into the marriage, as well as all property acquired during the marriage unless acquired jointly. The trial court granted Wife a divorce on the ground of inappropriate marital conduct. The trial court classified and divided the parties' separate and marital property in accordance with the antenuptial agreement. As a result, Husband was allowed to retain much of his separate property and retirement. The trial court denied Wife's requests for alimony and attorney's fees. Wife has appealed. For the reasons stated below, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

David W. Garrett, Nashville, Tennessee, for the appellant, Marilynne Macleod Reed.

Sonya W. Henderson, Murfreesboro, Tennessee, for the appellee, John William Reed.

**OPINION**

### *Factual and Procedural Background*

John William Reed ("Husband") and Marilynne MacLeod Reed ("Wife") were married on December 28, 1994. At the time of the marriage, Husband was forty-one (41) years old and Wife was fifty-one (51) years old. The parties entered the marriage with children from previous marriages, ongoing businesses, and substantial separate property. Prior to and throughout the marriage, Husband worked as Captain Inspector for the City of Murfreesboro Fire Department and also owned and operated Shady Creek Farm, a horse training and boarding facility. Wife began training horses

in 1967 and had been professionally involved in the horse training business since at least 1991, when she met Husband and began training at Shady Creek Farm.

Prior to the marriage, the parties entered into an antenuptial agreement, designed to handle the disposition of the parties' property in the event of death or divorce. The antenuptial agreement provided, in pertinent part, as follows:

SECTION ONE: PROPERTY OF THE PARTIES

Prospective wife owns property as scheduled in Exhibit A. Prospective husband owns property as scheduled in Exhibit B.

SECTION TWO:  INTENT OF THE PARTIES

The parties intend and desire that all property owned respectively by each of them at the time of the marriage shall be his/her respective property free from any claims of the other party.  The parties further intend that all property inherited by him/her during the course of marriage shall be his/her respective property.  The parties further intend and desire that all property acquired by each of them from any source during their marriage shall be his/her respective property, except as hereinafter provided.

. . . .

SECTION SIX:  AFTER-ACQUIRED PROPERTY

All property acquired after the marriage of the parties shall be the separate property of the parties, with all rights, title, and interest exclusively in that party, unless the parties acquire joint title to said property, in which case the property shall be joint property.

SECTION SEVEN: MANAGEMENT OF PROPERTY

Each party shall have sole management and control over his/her property.

. . . .

SECTION TWELVE: SCOPE OF AGREEMENT

The provisions contained in this agreement represent the entire understanding between John William Reed and Marilynne Orr pertaining to their respective property and marital property rights.

Pursuant to section one of the agreement, the parties attached separate exhibits to the premarital agreement, listing the separate property each maintained entering the marriage. Included among the items Wife listed as her separate property were the following: a "Note" for real property located in California, secured by a deed of trust in the principal amount of $175,000.00; a "Note" in the principal amount of $30,000.00; a one-half (½) interest in real property located at 4398 Sulphur Springs Road, Murfreesboro, Tennessee; four walking horses and a one-half (½) interest in another; two vehicles; two IRAs worth $4,000.00; $9,000.00 in savings at Third National Bank; household furnishings; a Steinway grand piano; Intarsia 17th Century Picture; jewelry; and antique dolls.

In Husband's exhibit to the antenuptial agreement, he listed, among other things, the following as his separate property: a "Farm" located at 4337 Sulphur Springs Road, Murfreesboro, Tennessee; a "Home" located at 4383 Sulphur Springs Road; "Rental Property" located at 4317 Sulphur Springs Road; $35,000.00 in savings at Third National Bank; his pension with the Murfreesboro Fire Department; five walking horses and one pony; "Farm Equipment;" horse and utility trailers; a coin, knife, and gun collection; three insurance policies; a one-half (½) interest in real property located at 4398 Sulphur Springs Road; two vehicles; $3,000.00 in checking account with Third National Bank; four grave lots; and eight acres of "real property/hayfields located on the east side of Sulphur Springs Road."

Dating from at least 1991, when Wife began training horses at Shady Creek Farm, and continuing throughout the marriage, the parties maintained a consistent business relationship with regards to the operation of Shady Creek Farm and the handling of clients' accounts. Husband maintained two bank accounts that are relevant to this appeal, a savings account (the "Savings Account"), and a checking account through which he controlled the finances of the farm (the "Farm Account"). Clients boarding and/or training their horses at Shady Creek Farm would make payments directly to Husband or to Shady Creek Farm. Husband would deposit those payments into the Farm Account and then remit to Wife an amount that represented her compensation for training and reimbursement for her expenses. Wife would then deposit those funds into her own separate bank account. Although Husband handled all the bookkeeping and check writing, Wife was heavily involved in the day-to-day management and operation of the farm. At some point during the marriage, Wife's name was added to the Farm Account, as well as the Savings Account, but Husband testified that her name was added to these accounts solely for emergency purposes. Wife claimed that the accounts, based on her understanding, were "all joint accounts." Prior to filing for divorce, Wife withdrew $40,000 from the Savings Account.

By November 2002, the parties' relationship had deteriorated, and Wife filed for divorce, asserting the grounds of adultery, inappropriate marital conduct, indignities, and irreconcilable differences. In her complaint, Wife asked the court to, among other things, make an equitable division of the horse training business; certain parcels of real property; vehicles; farm equipment; checking and savings accounts; and Husband's pension plan with the City of Murfreesboro. Husband filed an answer and counterclaim for divorce, asserting grounds of irreconcilable differences and inappropriate marital conduct. In his answer, Husband took issue with Wife's

classification of many of the assets as marital property. Further, Husband asserted that the issues of property division should be governed by the parties' antenuptial agreement.

Following a trial, the court entered a Final Decree of Divorce, ordering as follows:

1. That [Wife] is hereby granted a divorce from [Husband] upon the grounds of inappropriate marital conduct, restoring both to the status of unmarried persons;

2. That the antenuptial agreement executed by the parties on December 22, 1994, is a valid agreement and incorporates the intent of the parties. The Court finds that said agreement has not been modified or amended since December 22, 1994[,] and the agreement shall be enforced in this matter;

3. The Court finds that Husband's checking and savings account[s] were not treated and/or act [sic] as marital accounts during the marriage and, accordingly, [were] not "after-acquired" property as defined by the antenuptial agreement. Husband is hereby awarded all funds in said accounts and Wife shall return the $40,000.00, presently held in her bank account, to Husband[;]

4. That Husband is awarded the following items of marital property:

(a) 5276 Leanna Swamp Road - value $131,000.00
(b) 7.5 acres and home at 3970 Leanna Road - equity value $17,000.00
(c) 1997 Ford F-350 - value $22,000.00 . . .[;]

5. That Wife is awarded the following items of marital property:

(a) 4398 Sulphur Springs Road - value $91,000.00
(b) 10 acre tract at 3970 Leanna Road - value $70,000.00
(c) Hawaii time share - value $4,500.00
(d) computer, laptop computer, stove, horse business program, DVD player - total value $2,500.00[;]

6. That Husband shall pay Wife $1,000.00 to "even-out" the marital property division;

7. That the following is Husband's separate property:

(a) All farm equipment with exception being given to the items awarded to Wife in Paragraph # 8
(b) Entire value of Husband's pension plan
(c) Husband's horses and livestock

(d) 1990 Ford F-150

8.  That the following is Wife's separate property:

(a) Wife's horses
(b) microscope kit
(c) equine densimeter
(d) artificial breeding mount
(e) sewing machine

9.   That Wife shall assume separate responsibility for payment of the outstanding property tax for 4398 Sulphur Springs Road[,] her credit card debts[,] and $700.00 to John Baker for the property appraisals;

10.  That Husband shall assume separate responsibility for payment of the mortgage on the 7.5 acres at 3970 Leanna Road and $600.00 to John Baker for the property appraisals;

11.  The Court finds that Wife is financially self-sufficient and her income exceeds her expenses, therefore, Wife's claim for alimony is denied.  Wife's request for Husband to pay for continuing health insurance coverage is denied.

12.  That Wife is hereby restored to the use of her maiden name, MacLeod;

13.  That each party shall pay their respective attorney's fees and litigation expenses, including expert witness fees;

14.  That court costs in this matter shall be divided equally between the parties, for which execution may issue, if necessary.

Wife appeals from the trial court's judgment and presents, as we perceive them, the following issues for our review:

(1)  Whether the trial court erred in interpreting the parties' antenuptial agreement and, thus, erred in classifying the separate and marital property of the parties;

(2)  Whether the trial court erred in the division of the marital assets of the parties;

(3)  Whether the trial court erred by failing to award Wife a divorce on the ground of adultery instead of inappropriate marital conduct;

-5-

(4)  Whether the trial court erred by failing to award Wife alimony; and

(5)  Whether Wife should have been awarded her attorney's fees by the trial court, and whether she should be awarded her fees on appeal.

### Standard of Review

In so far as these issues involve questions of fact, we review the trial court's findings of fact *de novo* upon the record accompanied by a presumption of correctness.  Tenn. R. App. P. 13(d) (2004); *Smith v. Smith*, 93 S.W.3d 871, 875 (Tenn. Ct. App. 2002).  The trial court's factual findings will be upheld as long as they are not contrary to the preponderance of the evidence.  *Smith*, 93 S.W.3d at 875.  However, the interpretation of antenuptial agreements, like any other contract, is a matter of law, subject to pure *de novo* review.  *See Bryant v. Bryant*, No. W2003-01906-COA-R3-CV, 2004 WL 948844, at *2 (Tenn. Ct. App. Apr. 28, 2004)(*no perm. app. filed*).

"[T]rial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount and duration." *Miller v. Miller*, No. M2002-02731-COA-R3-CV, 2003 WL 22938950, *5 (Tenn. Ct. App. Dec. 10, 2003)(*no perm. app. filed*)(citing *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001)).  An award of attorney's fees in divorce cases is generally recognized as alimony and, therefore, is subject to the same standards that govern alimony determinations.  *See Miller*, 2003 WL 22938950, at *5–6.  Thus, the trial court's decisions regarding alimony and attorney's fees will not be reversed absent a clear showing of an abuse of discretion.  *See id*.

### (1)  Antenuptial Agreement

Wife's first issue involves the trial court's classification of the parties' separate and marital property.  The parties, however, entered into an antenuptial agreement.  Therefore, we will look first to that agreement to decide to what extent the issues of property classification and division have been previously agreed upon.

Although not specifically raised as an issue, we will address, as a preliminary matter, the enforceability of the antenuptial agreement.  Wife intimates that the antenuptial agreement was drafted by a client-friend of Husband and that Wife was without independent counsel during the negotiation of the agreement.  Husband asserts that the attorney who drafted that agreement was, in fact, a close friend of Wife.  Section 36-3-501 of the Tennessee Code, which governs the enforcement of premarital agreements, provides that an antenuptial agreement will be binding on the court only "if such agreement is determined, in the discretion of [the] court, to have been entered into by [the] spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse." Tenn. Code Ann. § 36-3-501 (2001).  Representation by independent counsel, however, is not a prerequisite to a finding that the parties entered into a premarital agreement freely and knowledgeably.  *Bryant*, 2004 WL 948844, at *4, (citing *Randolph v.*

*Randolph*, 937 S.W.2d 815, 822 (Tenn. 1996)). From our review of the record, it appears that the attorney who drafted the agreement could properly be characterized as a "mutual" friend. There is nothing else in the record to suggest that the parties entered into the antenuptial agreement in a manner other than "freely, knowledgeably and in good faith." Likewise, the record does not reveal any evidence of duress or undue influence. Therefore, we conclude that the evidence does not preponderate against the trial court's finding that the agreement was valid and enforceable.

Turning to the language of the antenuptial agreement at issue here, the parties specifically set forth their intent in Section Two of the agreement, entitled "Intent of the Parties." Within that paragraph, the parties state their intention that each party would retain, as his/her separate property, the property owned respectively by each of them at the time of the marriage. Section Two further states that "[t]he parties further intend and desire that *all property*[1] acquired by each of them *from any source* during their marriage shall be his/her respective property, *except as hereinafter provided*." Under Section Six of the agreement, entitled "After-Acquired Property," the parties provided that "[a]ll property acquired after the marriage of the parties shall be the separate property of the parties . . . *unless the parties acquire joint title to said property, in which case the property shall be joint property*."

### *(a) Bank Accounts*

Neither party disputes the fact that Husband owned both the Farm and Savings Accounts prior to the marriage. It is also undisputed that, at some point during the marriage, Husband added Wife's name to both the Farm Account and the Savings Account. Likewise, Wife added Husband's name to all but one of her separate bank accounts. Husband, however, claims that the parties agreed to add the other's name to his/her respective accounts for use in the event of an emergency. Husband further asserts that, during the marriage, neither party made any deposits in, or withdrawals from, the other's account. Wife claims that she had on occasion written checks from the Farm Account at Husband's direction, although, at trial, she could not produce any evidence of this claim.

Wife argues that, by titling the bank accounts in both parties' names, Husband has converted the funds in these accounts to joint property, thereby triggering Section Six of the parties' antenuptial agreement. Accordingly, Wife contends that these bank accounts should be considered marital property, and the funds in those accounts should be subject to equitable division. The trial court found that the bank accounts were not treated as marital accounts by the parties during the marriage and, thus, were not "after-acquired" property as defined by the antenuptial agreement. This led the

---

[1]The agreement did not define the term "property." Therefore, as there is no limiting definition for the term, we will look to the plain meaning of the term "property." *Planters Gin Co. v. Federal Compress and Warehouse Co.*, 78 S.W.3d 885, 889–90 (Tenn. 2002). Black's Law Dictionary defines "property" broadly as "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised." Black's Law Dictionary 1232 (7th ed. 1999). Thus, we conclude that the parties intended that "all property" should be interpreted to encompass property of any sort, including earnings from employment, retirement or elsewhere.

trial court to conclude that the bank accounts were Husband's separate property, and, therefore, he should receive the funds in those accounts.[2]

It is well-settled that parties may control the disposition of property upon divorce by way of a valid antenuptial agreement. Tenn. Code Ann. § 36-3-501 (2001); *Kahn v. Kahn*, 756 S.W.2d 685, 694 (Tenn. 1988). A valid antenuptial agreement is the same as any other contract and should be interpreted using principles of construction that apply to other written agreements. *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). In construing a contract, courts should seek to identify the intent of the parties as set forth in the language of the contract. *City of Cookeville ex rel. Cookeville Regional Med. Ctr. v. Humphrey*, 126 S.W.3d 897, 904 (Tenn. 2004); *Wilson*, 929 S.W.2d at 373. Antenuptial agreements, because they are favored by public policy, are construed liberally to give effect to the intention of the parties. *Sanders v. Sanders*, 288 S.W.2d 473, 477 (Tenn. Ct. App. 1955). In general, the provisions of a contract must be examined in the context of the entire agreement. *Wilson*, 929 S.W.2d at 373. Contractual terms should be given their plain, ordinary meaning and "should be construed harmoniously to give effect to all provisions and to avoid creating internal conflicts." *Id.* With respect to antenuptial agreements, the substance of the parties' intent will prevail over the form of the instrument, and the agreement "will not be held invalid for technical or trifling reasons." *Sanders*, 288 S.W.2d at 478.

By construing the antenuptial agreement as a whole, there is a clear indication that the parties intended that they would each retain and control their respective property throughout the course of the marriage. Upon reviewing Section Six in the context of the entire antenuptial agreement, we are led to the conclusion that the parties intended this provision to address the situation where the parties purchased property together as joint tenants during the marriage. We do not believe that the "After-Acquired Property" section was designed to address the situation presently before this Court, where the parties agreed during the marriage to add the other's name to previously held accounts for convenience or in the case of an emergency. In addition, we note that the record overwhelmingly reflects that each party maintained exclusive control over his/her respective bank accounts during the marriage, regardless of how the account was titled. It is equally evident that the parties adamantly adhered to this separate property regimen throughout the course of the marriage. Therefore, we affirm the trial court's decision finding that Husband's bank accounts remained his separate property.

### (b) Farm Equipment

In the divorce decree, the trial court awarded Husband, as his separate property, all the farm equipment, except for a microscope kit, equine densimeter, and an artificial breeding mount, which the trial court awarded to Wife. In conjunction with her argument that the bank accounts should have been classified as joint marital property, Wife argues that the trial court erred in not classifying as marital property various items of farm equipment purchased during the marriage with funds from

---

[2]As part of the divorce decree, Wife was ordered to return to Husband the $40,000.00 that she removed from the Savings Account prior to filing for divorce.

those accounts. However, because we have determined that Husband's bank accounts were his separate property, it follows that the farm equipment purchased with those funds would not necessarily be marital property as Wife contends.

At trial, Husband testified in reference to the relevant aspects concerning the purchase of each individual item of farm equipment. During his testimony, he explained the value of the equipment; from whom the equipment was purchased; whether the item was purchased before or during the marriage and by whom; and whether he desired to retain the equipment as his separate property. Husband testified that much of the equipment was either purchased prior to the marriage, was listed as his separate property under Exhibit "B" to the antenuptial agreement, or was purchased during the marriage with funds from the Farm Account. In light of our decision regarding the antenuptial agreement and the evidence in the record, we conclude that the trial court appropriately classified and divided the farm equipment in this case.

### (c) Increase in Value of Husband's Pension as Marital Property

In his exhibit to the antenuptial agreement listing his separate property, Husband listed his "Pension with the Murfreesboro Fire Department." Wife asserts that the agreement does not address the increase in value of the pension account that accrued during the marriage. Therefore, Wife argues that the amount of that increase should be considered marital property. Wife further contends that, because the antenuptial agreement was prepared by "Husband's attorney," any ambiguity in the contract's language should be construed against Husband.

First, the record does not support Wife's claim that the antenuptial agreement was drafted or prepared by "Husband's attorney." Thus, Wife's argument that this agreement should be controlled by the rule of interpretation requiring ambiguous contract language to be construed against its drafter is without merit.

Under Section Two of the agreement, the parties stated that they "intend and desire that all property acquired by each of them from any source during their marriage shall be his/her respective property. . . ." The parties further restated that intention under Section Six of the agreement. Even without specifically listing the increase in value of Husband's pension, the intent of the antenuptial agreement is clear. We conclude that the parties intended that any increase in value of Husband's pension during the marriage was to remain Husband's separate property. Accordingly, we affirm the trial court's finding in that respect.

### (2) Division of the Marital Assets

After classifying the parties' property as either marital or separate, the trial court divided the marital property as set forth above. Wife argues that the trial court's division of the marital assets should be set aside because the trial court erred by classifying as Husband's separate property the Farm and Savings Accounts, his pension, and the farm equipment. Wife's argument is premised on the notion that, should this Court hold that the bank accounts, pension, and farm equipment were

marital property, Wife would be entitled to an equitable division of those items. However, as we have concluded that these items remained Husband's separate property, they are not subject to equitable division.

Trial courts are granted broad discretion when dividing the marital estate, and such decisions are "entitled to great weight on appeal." *Watters v. Watters*, 959 S.W.2d 585, 590 (Tenn. Ct. App.1997) (citing *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn Ct. App.1988)). Appellate courts will generally defer to a trial court's division of property unless it is inconsistent with the factors enumerated in section 36-4-121(c)[3] of the Tennessee Code or is against the weight of the evidence. *Id*. In issuing its ruling from the bench, the trial court addressed each of the factors listed in section 36-4-121(c), applying those factors applicable to this case. In the divorce decree, the parties received a roughly equal division of the value of the marital estate. Upon review of the record, we conclude that the trial court's division of the marital property was in line with the weight of the evidence. Accordingly, we affirm the trial court on this issue.

### *(3) Grounds for Divorce*

During the trial, Husband stipulated that he was guilty of adultery. Additionally, the record reflects that Husband was involved in other extra-marital affairs during the course of the parties' marriage. The record also revealed evidence of some physical altercations and allegations by Wife involving domestic abuse by Husband. Although Husband stipulated to adultery, he alleged that Wife was guilty of inappropriate marital conduct. Husband complained that Wife mistreated him by putting her son and her business ahead of him. Also, during his testimony he alluded to certain

---

[3]Section 36-4-121(c) sets forth the following factors trial courts should consider when making an equitable division of the marital estate:

> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
> (6) The value of the separate property of each party;
> (7) The estate of each party at the time of the marriage;
> (8) The economic circumstances of each party at the time the division of property is to become effective;
> (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other foreseeable expenses associated with the asset;
> (10) The amount of social security benefits available to each spouse; and
> (11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (Supp. 2004)

non-traditional relationships in which he believed Wife was involved. Notwithstanding Husband's stipulation to adultery, the trial court granted a divorce to Wife on the ground of inappropriate marital conduct. Wife asserts that it was error for the court not to grant the divorce on the ground of adultery, in light of Husband's admissions. While it is true that Husband admitted to adultery, the record also supports the trial court's decision to grant the divorce to Wife on the ground of inappropriate marital conduct. *See Fulbright v. Fulbright*, 64 S.W.2d 359, 364 (Tenn. Ct. App. 2001) ("[W]e do not believe the Trial Court was required to state with specificity in its order exactly what Husband's inappropriate marital conduct was[,] given his admitted adultery."). Therefore, we affirm the trial court's decision in this regard.

## *(4) Alimony*

We begin by noting that the parties' antenuptial agreement did not address the issue of alimony. However, the parties were married in 1994, prior to the Tennessee Supreme Court's opinion in *Cary v. Cary*, 937 S.W.2d 777 (Tenn. 1996), which approved for the first time the right of parties to waive or limit alimony through an antenuptial agreement. *See id.* Therefore, we are unable to infer from the absence of such a provision whether the parties contemplated that alimony might be warranted in the event of a divorce.

The trial court denied Wife's request for alimony. In issuing its ruling from the bench, the trial court correctly stated that the two most important factors to consider in making an alimony determination were the need of the recipient spouse and the obligor spouse's ability to pay. The trial court then made the following findings:

> In this particular case[,] Mrs. Reed came into the marriage self-sufficient. She has remained self-sufficient during the marriage. They have maintained their property separately. In looking at her list of expenses, I noted yesterday that we had some $2,000 worth of expenses that were listed basically as business expenses for her horse business. But there was not any indication of income from that business. So[,] either that horse business is losing money, which if that is the case she needs to get rid of the business. If she is making money, then obviously those expenses are being covered by whatever she's making. So taking those out of the mix, she has sufficient income for her living expenses. In fact, she has well over a thousand dollars a month in excess of her expenses that she has listed, if we take those out. So the request for alimony is denied.

Wife argues that the trial court failed to properly consider the statutory factors applicable to alimony determinations. She further argues that the court's finding that Wife "came into the marriage self-sufficient" is inaccurate because, prior to the marriage, Wife was receiving $4,000.00 per month in alimony payments from her former husband. Additionally, Wife argues that the trial court inappropriately discounted the expenses related to the breeding, training, and upkeep of her personal horses.

-11-

Similar to the division of marital property, the trial court's determination of whether to award alimony is guided by statutory factors found in section 36-5-101(E) of the Tennessee Code. Tenn. Code Ann. § 36-5-101(E) (Supp. 2004). Section 36-5-101(E) provides that, in determining the nature, amount, length of term, and manner of alimony payment, the trial court shall consider all relevant factors, including:

> (I) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (ii) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
> (iii) The duration of the marriage;
> (iv) The age and mental condition of each party;
> (v) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (vi) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be the custodian of a minor child of the marriage;
> (vii) The separate assets of each party, both real and personal, tangible and intangible;
> (viii) The provisions made with regard to the marital property as defined in § 36-4-121;
> (ix) The standard of living of the parties established during the marriage;
> (x) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (xi) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and
> (xii) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(E)(i)–(xii). While the statute sets forth many factors, the two most important factors are (1) the need of the recipient spouse and (2) the obligor spouse's ability to pay, with the single most important factor being the recipient spouse's need for support. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Scarbrough v. Scarbrough*, No. W2000–01807-COA-R3-CV, 2001 WL 640368, at * 2, 4 (Tenn. Ct. App. June 8, 2001)(*no perm. app. filed*). The trial courts have broad discretion in applying the factors set forth in section 36-5-101(E). *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998). Therefore, "[a]ppellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes." *Id.*

Turning to the question of Wife's need for spousal support, in Wife's statement of income and expenses[4] she stated that she is self-employed as a walking horse trainer. She receives $2,500.00 per month in gross income from training ten horses. She receives an additional $1,458.33 per month from note payments from her sister. Wife also receives a yearly dividend from Standard Saving Bank stock, which in 2003 equaled $750.00 per month. Wife's total monthly income, before taxes, is $4,708.33. This amount, as the trial court found, does not include any income earned from the breeding and training of her three personal horses.

Wife's Rule 12.02 statement listed total monthly expenses amounting to $5,794.83. This amount included approximately $2,000.00 per month in expenses related to boarding, training, breeding, and maintenance of her three personal horses. The trial court deducted this amount from Wife's total expenses because Wife had not adequately shown where she generated income from those three horses. Therefore, the trial court found that, by "taking those [expenses] out of the mix," Wife earned income roughly $1,000.00 in excess of her living expenses. As a result, the trial court denied Wife's request for alimony.

The trial court's finding that Wife earned enough income to offset her expenses is supported by the record. Furthermore, the record supports the trial court's finding that Wife was "self-sufficient" when she entered the marriage and remained so throughout the marriage. We are unpersuaded by Wife's argument that she was not self-sufficient because she was receiving $4,000.00 per month in alimony from a previous marriage. It appears instead that Wife consciously and voluntarily forfeited that alimony when she agreed to marry Husband. Additionally, there is nothing in the record to indicate the amount of Social Security retirement benefits Wife may be entitled to in the future. Moreover, as part of the property division, Wife received, along with her separate property, the debt-free marital home, as well as an additional parcel of real property valued at $70,000.00. Although the trial court did not make specific findings as to each factor under section 36-5-101, there is nothing to suggest that the court did not consider the other factors when making its determination. In view of the conclusion that Wife has failed to demonstrate that she is in need of alimony, we affirm the trial court on this issue.

### *(5) Attorneys' Fees*

Both parties requested their respective attorney's fees at trial. Finding that each party had sufficient assets to pay his/her own attorney's fees, the court denied both requests and ordered that the court costs be divided equally between the parties. Wife appeals the denial of her attorney's fees at trial and also requests an award to defray her legal expenses on appeal. Wife asserts that she should not be responsible for her attorney's fees because she was granted the divorce based upon the fault of Husband and was not awarded liquid assets or alimony.

---

[4]Under Rule 12.02 of the Rutherford County Chancery Court's local rules of practice, parties in any contested divorce action must file a statement with the court setting forth all issues relevant to the divorce, including a statement of income and a list of itemized expenses.

"An award of legal expenses is considered to be alimony." *Wallace v. Wallace*, 733 S.W.2d 102, 110 (Tenn. Ct. App. 1987). As with decisions involving alimony, decisions involving attorneys' fees are within the sound discretion of the court and will not be disturbed absent evidence preponderating to the contrary. *Luna v. Luna*, 718 S.W.2d 673 (Tenn. Ct. App. 1986) (citing *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983); *Hardin v. Hardin*, 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983)). As with the trial court's decision regarding alimony, we cannot say that the trial court abused its discretion in ordering the parties to bear their own legal expenses. Wife's request for her attorney's fees on appeal is respectfully denied. Accordingly, we affirm on this issue.

### *Conclusion*

For the reasons stated herein, the judgment of the trial court is affirmed. Costs of this appeal are taxed against the Appellant, Marylynne MacLeod Reed, and her surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

-14-