IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 7, 2000 Session

## LOLA ANN NEUGEBAUER TAYLOR v. JAMES RUSSELL TAYLOR

**Appeal from the Circuit Court for Rutherford County**
**Nos. 40639 & 40939     Royce Taylor, Judge**

**No. M1999-02398-COA-R3-CV - Filed June 6, 2003**

This appeal arises from the dissolution of a four-year marriage. The wife sought a divorce in the Circuit Court for Rutherford County because of the husband's chronic drunkenness, non-support, and threats of violence. Following a bench trial, the court granted the wife a divorce on the ground of inappropriate marital conduct. The trial court also divided the martial estate, gave the wife custody of the parties' four-year-old daughter, and directed the husband to pay child support. On this appeal, the husband asserts that the trial court erred in its classification and division of the marital property, that the trial court awarded an excessive amount of child support, and that the trial court erred by denying his request to place a portion of his child support in an educational trust fund. For her part, the wife requests an additional award to defray her legal expenses for this appeal. We conclude that the trial court (1) correctly classified and divided the marital estate, (2) properly sequestered a portion of the husband's assets to assure the timely and regular payment of his child support, and (3) properly declined to establish an educational trust fund for the child. We also conclude that the trial court erred by failing to direct the trial court clerk to return the remainder of the sequestered funds to the husband when his child support obligation ceased. In addition, we decline to award the wife her legal expenses for this appeal or to find that this appeal was frivolous.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Modified in Part and Affirmed in Part**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Jim Wiseman, Murfreesboro, Tennessee, for the appellant, James Russell Taylor.

Charles Patrick Flynn, Brentwood, Tennessee, for the appellee, Lola Ann Neugebauer Taylor.

**OPINION**

**I.**

Lola Ann Neugebauer met James Russell Taylor in 1993 when he responded to her call for a taxi. Ms. Neugebauer was a thirty-year-old, recently transplanted Texan who had never been married. Mr. Taylor was forty-two years old and had been married once. They began dating immediately and soon thereafter purchased a house in Christiana together. They were married on June 11, 1994, and their only child was born on May 9, 1995.

Ms. Taylor did not bring any substantial assets to the marriage. However, even though he was driving a taxi, Mr. Taylor had inherited several assets, including an antique collection valued at approximately $50,000 and a twelve-acre tract of commercially valuable real property on the Shelbyville Highway in Murfreesboro. At Mr. Taylor's insistence, the parties signed an antenuptial agreement to ensure that the real property remained with Mr. Taylor's family.[1]

Ms. Taylor had completed one year of community college in Texas before she moved to Tennessee. She obtained a job preparing title policies for a law firm in Murfreesboro, and by 1996, she had become the general manager for a title agency in Rutherford County. By 1998, she earned more than $45,000 per year. Mr. Taylor earned approximately $300 per week driving a taxi until he lost his driver's license. Ms. Taylor knew that Mr. Taylor used "a little bit of pot" when they were married but did not believe that he had a substance abuse problem. All this changed following the birth of the parties' daughter in May 1995.

Mr. Taylor quit his job as a taxi driver approximately one month after the birth of the parties' daughter because he had lost his driver's license. He worked only sporadically during the remaining years of the marriage and used the money he earned to buy himself alcohol, cigarettes, and drugs. He ceased contributing to the household expenses and spent very little time at home – preferring to spend his time in local bars instead. He often came home in the middle of the night and awakened Ms. Taylor and their daughter by yelling at them in a drunken stupor.

During 1996, the parties engaged in three transactions that are significant to the issues raised on this appeal. On January 25, 1996, they executed a deed conveying the Christiana property to themselves as tenants by the entirety with a right of survivorship. On the same day, Mr. Taylor executed a quitclaim deed conveying the twelve-acre tract on the Shelbyville Highway to himself and Ms. Taylor as tenants by the entirety. On September 16, 1997, the parties sold 7.56 acres of the property on the Shelbyville Highway for $131,999.03. They used approximately $30,000 of the proceeds to pay marital debts, especially credit card bills, and they put the remaining funds in a joint savings account. They also listed the remaining four acres of the Shelbyville Highway property for sale at an asking price of $600,000.

The parties' home life continued to decline. In September 1998, Ms. Taylor filed a petition for a protective order in the Circuit Court for Rutherford County describing three years of domestic violence in which Mr. Taylor customarily threatened and shoved her. She also alleged that on September 1, 1998, Mr. Taylor threatened to kill her in the presence of their daughter. The trial court issued an ex parte order of protection on September 8, 1998, and when Mr. Taylor failed to respond, entered an order of default awarding temporary custody of the parties' daughter to Ms. Taylor. The order restrained Mr. Taylor from contact with Ms. Taylor except as needed for visitation with their child and directed Mr. Taylor to pay $50.40 per week as child support to the clerk of the court.

---

[1]The record is ambiguous with regard to when the parties signed this agreement. Ms. Taylor states in her interrogatory responses that she signed the agreement on the day before the wedding and that Mr. Taylor signed it twenty days later. Mr. Taylor insists that he signed it when Ms. Taylor did. The notary public who authenticated the parties' signatures admitted that she was not present when Ms. Taylor signed the agreement, that she did not observe Mr. Taylor sign it, and that she notarized the agreement as of the date provided by Mr. Taylor. Notwithstanding these irregularities, the trial court determined that the agreement had been properly executed, and the parties have not contested the point on this appeal.

Ms. Taylor filed suit for divorce on November 23, 1998 after the parties' daughter found drug paraphernalia in their home. She also filed a petition seeking to hold Mr. Taylor in contempt for failing to pay the child support required by the order of protection. Because Mr. Taylor had no known address at the time, the sheriff's office served him with the contempt papers at a bar named Carney's. The trial court thereafter consolidated the divorce and contempt cases for trial.

At trial, the parties stipulated the grounds for divorce but contested the division of their property. The trial court, sitting without a jury, granted Ms. Taylor a divorce on the ground of inappropriate marital conduct. In its division of the marital estate, the trial court classified both the Christiana property and the Shelbyville Highway property as marital property. The trial court directed that the Shelbyville Highway property be sold and that each party receive one-half of the net proceeds from the sale.

The trial court also approved Ms. Taylor's proposed parenting plan that gave her sole custody of the parties' daughter and that obligated Mr. Taylor to pay $90 per week in child support. In light of Mr. Taylor's track record for paying child support, the court directed 21% of his share of the capital gains from the sale of the Shelbyville Road property be paid to Ms. Taylor as child support. The trial court also directed that $50,000 of Mr. Taylor's share of the proceeds from the sale of the Shelbyville Road property be deposited with the trial court clerk for the benefit of the parties' child and authorized Ms. Taylor to withdraw $90 per week as child support. The trial court finally directed that any funds being held by the trial court clerk should be paid over to the child on her eighteenth birthday. Mr. Taylor has appealed.

## II.
### THE CLASSIFICATION AND DIVISION OF THE MARITAL PROPERTY

Mr. Taylor takes issue with the trial court's decision to classify the Christiana property and the Shelbyville Road property as marital property and the manner in which the court divided the parties' marital estate. Specifically, he asserts that the court's classification decision runs afoul of the prenuptial agreement and that the court awarded Ms. Taylor an inequitably large share of the marital estate. We have determined that the manner in which the trial court classified and divided the parties' property was legally correct and equitable.

### A.

Dividing a marital estate necessarily begins with the classification of the parties' property as either separate or marital property. *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001); *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998). Tennessee is a "dual property" state. *Smith v. Smith*, 93 S.W.3d 871, 875-76 (Tenn. Ct. App. 2002). Accordingly, property cannot be included in the marital estate unless it fits within the definition of "marital property" in Tenn. Code Ann. § 36-4-121(b)(1)(A) (Supp. 2002). By the same token, "separate property," as defined in Tenn. Code Ann. § 36-4-121(b)(2), should not be included in the marital estate.[2] Because

---

[2] The dividing line between marital and separate property frequently becomes blurred. Marital property can become separate property when one spouse gives it to the other spouse. *Kinard v. Kinard*, 986 S.W.2d 220, 232 (Tenn. Ct. App. 1998); *Hanover v. Hanover*, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1989). On the other hand, separate property
(continued...)

property classification issues are questions of fact, *Mitts v. Mitts*, 39 S.W.3d 142, 144-45 (Tenn. Ct. App. 2000); *Brown v. Brown*, 913 S.W.2d 163, 167 (Tenn. Ct. App. 1994), appellate courts will review a trial court's classification decisions using the familiar standard of review in Tenn. R. App. P. 13(d).

Once a trial court has classified the property as either marital or separate, it should place a reasonable value on each piece of property subject to division. *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003); *Robertson v. Robertson*, No. M1999-02103-COA-R3-CV, 2001 WL 459100, at *3 (Tenn. Ct. App. May 2, 2001) (No Tenn. R. App. P. 11 application filed). The parties themselves must come forward with competent valuation evidence. *Kinard v. Kinard*, 986 S.W.2d at 231; *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). When valuation evidence is conflicting, the court may place a value on the property that is within the range of the values presented by all the relevant valuation evidence. *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997); *Brock v. Brock*, 941 S.W.2d 896, 902 (Tenn. Ct. App. 1996). Decisions regarding the value of marital property are questions of fact. *Kinard v. Kinard*, 986 S.W.2d at 231. Accordingly, they are entitled to great weight on appeal and will not be second-guessed unless they are not supported by a preponderance of the evidence. *Smith v. Smith*, 93 S.W.3d at 875; *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995).

Once the parties' marital property has been classified and valued, the trial court's goal is to divide the marital property in an essentially equitable manner. Tenn. Code Ann. § 36-4-121(a)(1); *Miller v. Miller*, 81 S.W.3d at 775. A division of marital property is not rendered inequitable simply because it is not precisely equal, *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002), *Cohen v. Cohen*, 937 S.W.2d at 832, or because each party did not receive a share of every piece of marital property. *Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001); *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998). The fairness of the trial court's approach is inevitably reflected in its results. *Bolin v. Bolin*, 99 S.W.3d 102, 107 (Tenn. Ct. App. 2002); *Watters v. Watters*, 959 S.W.2d at 591.

Dividing a marital estate is not a mechanical process but rather is guided by considering the factors in Tenn. Code Ann. § 36-4-121(c). *Kinard v. Kinard*, 986 S.W.2d at 230. Trial courts have wide latitude in fashioning an equitable division of marital property, *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983); *Manis v. Manis*, 49 S.W.3d at 306, and appellate courts accord great weight to a trial court's division of marital property. *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996); *Edwards v. Edwards*, 501 S.W.2d 283, 288 (Tenn. Ct. App. 1973). Thus, we will ordinarily defer to the trial court's division of the parties' marital estate unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence. *Brown*

---

[2](...continued)

can become marital property when its owner commingles it with marital property and no longer treats it as separate property. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002); *Smith v. Smith*, 93 S.W.3d at 878; *Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988). Even if property is clearly separate, the increase in the property's value during the marriage and the income from the property may be considered marital property if the nonowner spouse contributed substantially to the separate property's preservation and appreciation. Tenn. Code Ann. § 36-4-121(b)(1)(B); *Cohen v. Cohen*, 937 S.W.2d 823, 832-33 (Tenn. 1996).

*v. Brown,* 913 S.W.2d at 168; *Mahaffey v. Mahaffey,* 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989); *Hardin v. Hardin,* 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983).

## B.

Mr. Taylor first takes issue with the trial court's decision to classify his interest in the Christiana property and the Shelbyville Highway property as marital property. He insists that treating these interests as marital property is inconsistent with the parties' antenuptial agreement, which reflected their intent to maintain the property they owned at the time of the marriage as their separate property. He also insists that the deeds the parties executed in 1996 and their joint use of the property do not provide a basis for varying the terms of the antenuptial agreement. We disagree.

Antenuptial agreements are statutorily favored vehicles for defining the status of property separately owned by a spouse prior to marriage. Tenn. Code Ann. § 36-3-501 (2001); *Cary v. Cary*, 937 S.W.2d 777, 781 (Tenn. 1996); *Soloman v. Murrey*, ___ S.W.3d ___, ___, 2002 WL 31319767, at *3 (Tenn. Ct. App. 2002). Properly negotiated antenuptial agreements are enforceable contracts, *Wilson v. Moore*, 929 S.W.2d at 373, and thus should be interpreted using the rules of construction ordinarily applicable to other written contracts. *Key v. Collins*, 145 Tenn. 106, 109, 236 S.W. 3, 4 (1921); *In re Estate of Wiseman*, 889 S.W.2d 215, 217 (Tenn. Ct. App. 1994). The cardinal rule of construction is that antenuptial agreements should be construed to give effect to the parties' intentions as reflected in the agreements themselves. *Sanders v. Sanders*, 40 Tenn. App. 20, 30-31, 288 S.W.2d 473, 477-78 (1955).

The parties' antenuptial agreement reflected their "mutual desire . . . that the real property now owned by each of the parties be and remain their respective, separate properties and under their respective sole ownership and control." To accomplish this purpose, paragraph 1 of the agreement provides, in part:

> Any real property, either now owned by the said JAMES
> RUSSELL TAYLOR (specifically including a parcel containing
> 11.38 acres, more or less, on the Shelbyville Highway and an [sic]
> one-half (½) interest in a house and lot in Christiana, Tennessee.) or
> hereafter acquired by him, with the proceeds of now owned property,
> shall be the separate property of the said JAMES RUSSELL
> TAYLOR.[3]

Paragraph 3 provides:

> All property acquired by either JAMES RUSSELL TAYLOR
> or LOLA A. NEUGEBAUER, or by both of them, after solemnization
> of the marriage, whether real or personal, shall be jointly owned
> property of the parties as tenants by the entirety, including all rents,
> issues, profits and proceeds of the property except, however, as above
> set forth.

---

[3]Paragraph 2 of the agreement contained an identical provision regarding Ms. Taylor's one-half interest in the house and lot in Christiana.

Paragraph 4 provides:

> This agreement shall become effective upon the solemnization of the marriage between the parties and shall be null and void if the proposed marriage fails to occur for any reason. This agreement shall be modified by a subsequent written agreement at any time JAMES RUSSELL TAYLOR commingles his separate property, or proceeds therefrom, with community property in order that JAMES RUSSELL TAYLOR'S separate interest in community property may be determined and preserved. Said agreement may be modified, amended, or rescinded at any time after the said marriage by a subsequent written agreement between the parties.

Paragraphs 5 and 6 state that the agreement does not preclude either Mr. Taylor or Ms. Taylor from making gifts of their real or personal property to each other. Finally, paragraph 9 provides, in part:

> Under no circumstances shall the following events, either individually or collectively, be considered evidence of an intention, either expressly or by implication, or of an agreement, actual or implied, to change the character of such separate property:
>
>    *    *    *
>
> c.  The commingling by either spouse of his or her separate funds or separate property with community funds or community property or with the separate funds or separate property of the other spouse so long as a written agreement as provided in Paragraph 4 hereinabove is entered into prior to said commingling;
>
> d.  Any oral statements by either spouse;
>
> e.  Any written document by either spouse, other than an express written agreement as provided for in Paragraph 4 hereinabove.

These four paragraphs contain three significant ambiguities that affect the outcome of this case.

The first ambiguity is found in paragraph 3, which states that the property acquired by either or both spouses during the marriage and the income or proceeds from this property shall be considered "jointly owned," and, therefore, marital property. This paragraph, however, contains an exception preceded by the following vague phrase: "except, however, as above set forth." As best as we can determine, consistent with the law in existence when this agreement was signed,[4] this

_____

[4]Courts must construe contracts consistently with the law in existence at the time the contract was signed. *Kee v. Shelter Ins.*, 852 S.W.2d 226, 228 (Tenn. 1993); *Robbins v. Life Ins. Co.*, 169 Tenn. 507, 510, 89 S.W.2d 340, 341 (continued...)

exception refers to the provision in paragraph 1 stating that the "proceeds of now owned property" belonging to Mr. Taylor prior to the marriage remained his separate property.[5]

The second ambiguity is found in the second sentence of paragraph 4 requiring the parties to execute a "subsequent written agreement" whenever Mr. Taylor "commingles his separate property, or proceeds therefrom, with community property." It is unclear whether the purpose of this agreement is to preserve the continuing separate character of commingled property or to confirm that the parties intended the commingled property to become marital property. The most logical and consistent interpretation of this provision is that it requires the parties to execute a subsequent written agreement to preserve the separate character of commingled property. We arrive at this conclusion for two reasons. First, the legal effect of commingling separate property with marital property is to change separate property into marital property.[6] Second, paragraph 9(c) specifically recognizes the legal effect of commingling and states that commingling will not have the effect of changing separate property into marital property "so long as a written agreement as provided in Paragraph 4 hereinabove is entered into prior to said commingling." Thus, commingling of separate property or the proceeds from separate property has the effect of transforming either the property or the proceeds into marital property unless the parties have entered into a "subsequent written agreement" to the contrary.

The third ambiguity stems from the vague antecedent reference of "said agreement" in the third sentence of paragraph 4. It is difficult to determine whether "said agreement" refers to the antenuptial agreement itself or to the "subsequent written agreement" required by paragraph 4 if the parties intend for commingled separate property to remain separate. Both the antenuptial agreement and the "subsequent written agreement" are mentioned in the preceding sentence. In light of Paragraph 9(e), the most logical conclusion is that the term "said agreement" refers to the "subsequent written agreement" described in the second sentence of paragraph 4. All other references to the antenuptial agreement are couched in terms of "[t]his agreement," and paragraph 9(e)'s reference to "an express written agreement" most logically appears to refer to the "subsequent written agreement" rather than the antenuptial agreement.[7]

---

[4](...continued)
(1936); *Winter v. Smith*, 914 S.W.2d 527, 537 (Tenn. Ct. App. 1995).

[5]There are two reasons for our conclusion. First, it is consistent with Tenn. Code Ann. § 36-4-121(b)(2)(C). Second, the exception language in paragraph 3 follows and appears to limit the scope of the phrase "all rents, issues, profits and proceeds of the property."

[6]*Langschmidt v. Langschmidt*, 81 S.W.3d at 747 (Tenn. 2002); *Smith v. Smith*, 93 S.W.3d at 878.

[7]It is commonly accepted that the parties to a written contract may freely change the terms of their contract by entering into a subsequent written contract. Similarly, the courts have noted that parties to a contract permitting only written amendments or changes may, by their conduct, waive their right to insist on only written modifications. *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 600-01 (Tenn. Ct. App. 1999). In addition, the courts may infer a subsequent modification to a written contract when the parties' conduct is sufficiently inconsistent with the written contract to warrant concluding that the parties intended to modify the terms of their agreement. *Southern Colo. MRI, Ltd. v. Med-Alliance, Inc.*, 166 F.3d 1094, 1099 (10th Cir. 1999); *Lauderdale County Sch. Dist. v. Enterprise Consol. Sch. Dist.*, 24 F.3d 671, 687 (5th Cir. 1994); *Danforth Orthopedic Brace & Limb, Inc. v. Florida Health Care Plan, Inc.*, 750 So. 2d 774, 776 (Fla. Dist. Ct. App. 2000).

Based on our understanding of these provisions of the antenuptial agreement, we construe the agreement to provide, expressly or by implication, that

(1)     The interests in real property owned by each spouse when they were married, and any proceeds from this property, remained their separate property.

(2)     All property acquired by either or both spouses during the marriage, except for the proceeds attributable to their separate property, became marital property.

(3)     Both spouses were permitted to make gifts of their separate property to the other spouse.

(4)     Both spouses could commingle their separate property with marital property or the other spouse's separate property, and commingled property became marital property unless the parties first executed a written agreement providing that the commingled property would remain separate property.

(5)     The spouses could amend the antenuptial agreement with another written agreement reflecting their intent to alter the status of their property.

We will examine the parties' interest in the disputed properties in light of our construction of their antenuptial agreement.

First, with regard to the Christiana property, the evidence shows that the parties conveyed their separate interests in the property to each other as tenants by the entirety without signing a separate agreement reflecting their intention for their interests to remain their separate property. These deeds provide written evidence of their agreement to commingle their interests in the property and to treat these interests as marital, as opposed to separate, property. In fact, they lived together in the house for the remainder of their marriage, and none of their conduct with regard to the property reflects an intention on either party's part to treat their former individual interests in the property as separate.

Similarly, Mr. Taylor conveyed the Shelbyville Road property to himself and Ms. Taylor as tenants by the entirety without first obtaining an agreement that the property would remain his separate property. The deed provides definitive written evidence of his intent to make an inter vivos gift of an undivided one-half interest in the property to Ms. Taylor. The parties' conduct following the conveyance is entirely consistent with this intent. Following the conveyance, the parties jointly sold 7.56 acres of the property and treated the proceeds of the sale as marital property by commingling them with other marital funds and by using them for marital purposes.

After considering the evidence in light of our construction of the antenuptial agreement, we are unpersuaded by Mr. Taylor's claims that his interest in the Christiana property or the Shelbyville Road property remained a separate property interest. Based on our construction of the antenuptial agreement, we have concluded that the evidence supports the trial court's conclusion that both the marital home in Christiana and the Shelbyville Road property should be classified as marital property.

Mr. Taylor also takes issue with the trial court's decision to award Ms. Taylor approximately one-half of the marital estate that included the remaining Shelbyville Road property. He asserts that the award to Ms. Taylor is inordinately large in light of the relative brevity of the marriage. We find no error in the manner in which the trial court divided the marital property and allocated the marital debts.

Unfortunately, Mr. Taylor overlooked Tenn. Ct. App. R. 7 (then designated as Tenn. Ct. App. R. 15) requiring appellants in divorce cases raising issues involving the amount or disposition of marital property to provide a table depicting the manner in which the trial court divided the marital estate. We have prepared this table ourselves based on the trial court's order and its valuation of the marital property:

### Marital Property[8]

| Wife | | Husband | |
|---|---|---|---|
| Marital home | $ 68,000.00 | 1/2 Marital home equity[8] | $ 3,500.00 |
| 1/2 Shelbyville Highway property | 300,000.00 | 1/2 Shelbyville Highway property | 300,000.00 |
| 100 shares Murfreesboro Bancorp | 1,250.00 | 100 shares Murfreesboro Bancorp | 1,250.00 |
| Household furnishings | 15,000.00 | 1/2 Household furnishings equity[8] | 7,500.00 |
| Nissan Maxima | 16,000.00 | 1/2 Nissan Maxima equity[8] | 1,500.00 |
| Putnam Investment Account | 8,633.33 | 1/2 Putnam Investment Account equity[8] | 4,316.66 |
| SunTrust savings | 274.63 | SunTrust savings equity[8] | 245.00 |
| SunTrust checking | 1,469.19 | 1/2 SunTrust checking equity[8] | 734.00 |
| Kemper account | 1,979.88 | 1/2 Kemper account equity[8] | 990.00 |
| **Total Property** | **$412,607.03** | | **$320,035.66** |

### Marital Debt

| Wife | | Husband | |
|---|---|---|---|
| Home mortgage | $ 61,000.00 | IRS[8] | $ 500.00 |
| Loan on Maxima | 13,000.00 | Credit card[8] | 4,785.00 |
| Unsecured marital liabilities | 9,570.00 | Hospital[8] | 500.00 |
| Judgment for Mr. Taylor | 8,684.00 | | |
| Mr. Taylor's share of Putnam Account | 4,316.66 | | |
| **Debt** | **$ 96,570.66** | | **$ 5,785.00** |
| **Wife's Net Property** | **$316,036.37** | **Husband's Net Property** | **$314,250.66** |

---

[8] The trial court awarded several marital assets to Ms. Taylor, but gave Mr. Taylor an offsetting cash award for one-half their value to be paid out of her share of the proceeds of the sale of the Shelbyville Highway property. The total amount of Mr. Taylor's equity interest in these assets, not including his interest in the Putnam Investment Account which was otherwise accounted for, was $14,469. The trial court deducted the three debts totaling $5,785 allocated to Mr. Taylor and directed Ms. Taylor to pay Mr. Taylor $8,684 [$14,469 - $5,785 = $8,684].

The factors to be considered in dividing a marital estate are delineated in Tenn. Code Ann. § 36-4-121(c). Among these factors is the duration of the marriage, and this court has recognized that the duration of a marriage is an important consideration when the marriage has been relatively short. We have stated that parties to a marriage of relatively short duration should, when practicable, be restored to their pre-divorce condition, not only with regard to their property, *McClellan v. McClellan*, 873 S.W.2d 350, 352 (Tenn. Ct. App. 1993); *Batson v. Batson*, 769 S.W.2d at 859, but also with regard to their need for spousal support. *Crain v. Crain*, 925 S.W.2d 232, 234 (Tenn. Ct. App. 1996). However, the duration of the marriage does not trump all the other factors that may be relevant in a particular case. As we have already noted, the process of dividing a marital estate in an equitable manner is not mechanical.

We have determined that the following factors are relevant and should influence the trial court's division of the marital estate in this case. First, the court allocated almost 95% of the marital debt – $96,570.66 – to Ms. Taylor. Second, the trial court placed the parties' child in Ms. Taylor's custody and, consistent with Tenn. Code Ann. § 36-4-121(d), awarded her the marital home to enhance the stability in the child's life. Third, Ms. Taylor became the primary breadwinner during the marriage, while Mr. Taylor did not contribute significantly to the financial health of the marriage and, if anything, dissipated assets. Fourth, Mr. Taylor received a valuable antique collection valued at $50,000 as his separate property. Based on these factors, and our consideration of the entire record, we have determined that the manner in which the trial court divided the parties' marital estate is essentially equitable.

## III.
### MR. TAYLOR'S CHILD SUPPORT OBLIGATION

Mr. Taylor raises four issues regarding his child support obligation. First, he asserts that the trial court should not have considered his capital gains from the sale of the Shelbyville Highway property as income for the purpose of calculating his child support obligation. Second, he takes issue with the amount of funds that the court sequestered to assure the payment of his child support obligation. Third, he insists that the court should have placed the sequestered capital gains in an educational trust fund. Finally, he asserts that the trial court should have directed the clerk to return to him any of the proceeds from the sale of the Shelbyville Highway property remaining in the clerk's possession when his child support obligation ends.

### A.

Providing an overview of the trial court's decision regarding Mr. Taylor's child support obligation will provide a context for addressing his specific points. Following the trial, it would have been evident to even the most casual observer that it was unlikely that Mr. Taylor would pay his child support in a timely and consistent manner. He had not done so prior to the trial and had accumulated a $1,130.40 arrearage. By the time of the divorce hearing, he could no longer drive a taxi because he had lost his driver's license, and he was working in a car wash. His poor work ethic and substance abuse made it likely that he would dissipate any valuable assets that might come into his hands rather than using them to assure that his child received the financial support she deserved. Accordingly, the trial court was faced with two challenges with regard to Mr. Taylor's child support – first, to arrive at the proper amount of the support; and second, to take appropriate steps to assure that this support would be paid over time.

-10-

Turning first to the amount of Mr. Taylor's child support obligation, the trial court determined that Mr. Taylor should pay $90 per week in child support. Then, to assure that this support would be paid over time, the trial court directed Mr. Taylor to pay into court a portion of his share of the marital estate and authorized Ms. Taylor to withdraw $90 per week from these funds. Under this arrangement, Mr. Taylor was not required to pay child support directly to Ms. Taylor unless the funds paid into court were depleted before his child support obligation ended. To create this fund, the trial court ordered Mr. Taylor to pay into court $50,000 of his share of the proceeds from the sale of the Shelbyville Highway property along with 21% of his share of the capital gains realized on the sale of the property. The trial court also determined that the parties' daughter would be entitled to receive the balance of the funds remaining in the trial court clerk's hands on her eighteenth birthday.

**B.**

Mr. Taylor first argues that the trial court erred by treating his share of the capital gains from the sale of the Shelbyville Highway property as income for the purpose of determining the amount of his child support obligation. The short answer to this argument is that the trial court did not base its assessment of Mr. Taylor's income on these capital gains.

As a general matter, all capital gains – even those realized from an isolated transaction – must be considered as gross income for the purpose of determining an obligor parent's child support obligation. Tenn. Comp. R. & Regs. r. 1240-2-4-.03(3)(a) (1994); *Brooks v. Brooks*, 992 S.W.2d 403, 407 (Tenn. 1999). The only judicially created exception to this rule involves capital gains resulting from the sale of an asset to fund the division of property in a divorce case. *Alexander v. Alexander*, 34 S.W.3d 456, 464 (Tenn. Ct. App. 2000). The purpose of this exception is to prevent the "double-dipping" that would result if capital gains were considered both as a marital asset and as income.

Without question, Mr. Taylor's capital gains realized from the sale of the Shelbyville Highway property could not have been treated as part of his gross income for child support purposes because the trial court had ordered this property sold as part of the division of the marital estate. However, the trial court did not calculate Mr. Taylor's income based on these capital gains but rather on imputed income from these funds. The trial court explained its calculation of Mr. Taylor's income clearly and succinctly as follows:

> It appears to me that he [Mr. Taylor] is capable of earning up to $300 a week, according to his own statement in his interrogatories and his testimony here today, when he is driving a cab. He's earning minimum wage now. He is also capable of earning money from the value of this property [the Shelbyville Highway property] when it is sold in some amount. And he could pay, clearly could pay, the amount that is suggested by the plaintiff of $360 a month, based upon those earnings and earnings that would be available to him from the sale of this property.

-11-

This statement demonstrates that the trial court recognized that Mr. Taylor's total gross income was made up of two income streams. The first was his earned income from his employment. The second was the income he could receive from the proceeds of the sale of the Shelbyville Highway property.

The distinction between the capital gains themselves and the imputed income from the investment of these capital gains is not only substantive but also is also outcome-determinative. The Child Support Guidelines permit the court to include in its calculation of the gross income of an obligor parent income imputed from valuable assets and resources that the parent owns or controls. Tenn. Comp. R. & Regs. r. 1240-2-4-.04(1)(f) (1989) states that "[v]aluable assets and resources (expensive home or automobile which seem inappropriate for the income claimed by the obligor) of the obligor should be considered for the purpose of imputing income and increasing the support award in any case if the court finds that equity requires it."

In one of our few decisions construing Tenn. Comp. R. & Regs. r. 1240-2-4-.04(1)(f), we declined to impute additional income to the obligor spouse because he had not concealed his income and resources and because "his lifestyle [had] absolutely nothing to do with the setting of child support." *Alexander v. Alexander*, 34 S.W.3d at 466. Our refusal to invoke Tenn. Comp. R. & Regs. r. 1240-2-4-.04(1)(f) in that case was not intended to limit its application to cases in which the extent of an obligor spouse's holdings reflects that he or she is hiding income. In appropriate circumstances, trial courts may impute additional income to a spouse when the spouse owns valuable assets or resources that, for whatever reason, are not currently producing income. Accordingly, the trial court did not abuse its discretion or act inequitably when it decided to base its calculation of Mr. Taylor's gross income, in part, upon the anticipated income stream from his share of the proceeds of the sale of the property.[9]

## C.

Mr. Taylor also complains that the trial court's decision to sequester 21% of his share of the capital gains from the sale of the Shelbyville Highway property was "inherently inequitable" because the trial court had already sequestered $50,000 to assure the payment of his child support. We find this argument unconvincing.

---

[9]While Mr. Taylor has taken issue with the trial court's consideration of his share of the capital gains from the sale of the Shelbyville Highway property, he does not take direct issue with the amount of his child support obligation if we determine that the trial court's treatment of his capital gains was proper. Therefore, the question of the amount of Mr. Taylor's child support obligation is not directly before us. However, we have concerns about the amount of the $90 per week child support award in light of our practical assessment of the income Mr. Taylor may actually be realizing from his share of the proceeds from the sale of the property.

A $90 per week child support obligation for one child reflects that the obligor parent nets approximately $1,840 per month. Thus, in light of Mr. Taylor's testimony that he nets approximately $1,118 per month at the car wash, the trial court must have determined that Mr. Taylor could earn an additional $722 per month from his share of the proceeds from the sale of the Shelbyville Highway property. Imputing this much additional income seems quite aggressive taking into consideration: (1) the tax consequences to Mr. Taylor from the sale of the property, (2) the requirement that he must deposit into court $50,000 plus 21% of his share of the capital gains with the trial court clerk, and (3) the prevailing rate of return on funds in the present market. It may be unrealistic to assume that Mr. Taylor can earn approximately $8,700 per year from investing the funds that are actually at his disposal. However, we must leave this question to the trial court because Mr. Taylor did not raise it on appeal.

-12-

Tennessee's trial courts have at their disposal a broad range of statutory remedies to assure the payment of child support in circumstances such as this. The obligor spouse's income is not the only source for child support payments. Tenn. Code Ann. § 36-5-102(a) (2001) permits the courts to use the obligor spouse's real and personal property to pay child support. Similarly, Tenn. Code Ann. § 36-5-103(a)(1) permits trial courts to enforce their child support orders by requiring the obligor parent to post a bond or to provide sufficient personal surety in accordance with Tenn. Code Ann. § 36-5-101(b). In addition, Tenn. Code Ann. § 36-5-103(a)(2) empowers trial courts to sequester income, rents, and profits from the obligor spouse's real and personal property to be used for the payment of child support.

The Tennessee Supreme Court has cautioned against ordering lump sum child support payments unless required to address a child's present and specific need. *Hobbs v. Hobbs*, 27 S.W.3d 900, 904 (Tenn. 2000). However, this holding involved a lump sum child support payment directly to the custodial spouse. It does not apply to a trial court's decision to sequester income or property under Tenn. Code Ann. § 36-5-102(a), -103(a)(2) to assure that child support is paid.

In this case, the trial court did not order that 21% of Mr. Taylor's share of the capital gains be paid directly to Ms. Taylor. Rather, the court directed that these funds be paid into court so that they would be available to meet Mr. Taylor's future child support obligation, whatever it might be. This remedy preserves the future flexibility required by the Tennessee Supreme Court in *Hobbs v. Hobbs*. Ms. Taylor will only be able to draw against these funds consistent with Mr. Taylor's child support obligation. The fact that these funds are on deposit with the court will not interfere with the trial court's decision should it at some future time determine that Mr. Taylor's child support obligation should be modified.

If Mr. Taylor's obligation to pay child support remains unchanged during the remainder of his daughter's minority, his child support payments will amount to approximately $64,000. These payments will be spread out over thirteen years, and it is inevitable that the child's needs will increase as she grows older. Accordingly, we decline to find that the trial court erred by sequestering 21% of Mr. Taylor's share of the capital gains from the sale of the Shelbyville Highway property along with $50,000 of the proceeds from the sale.

**D.**

Mr. Taylor also asserts that if sequestering 21% of his share of the capital gains from the sale of the Shelbyville Highway property was justified, the trial court should have placed these funds in an educational trust in accordance with Tenn. Comp. R. & Regs. r. 1240-2-4-.04(3) (1997). Decisions establishing an educational trust fund are discretionary. *Bryan v. Leach*, 85 S.W.3d 136, 153 (Tenn. Ct. App. 2001). We have determined that the trial court's denial of Mr. Taylor's request for an educational trust fund is consistent with the facts and the applicable law.

The educational trust fund provisions in the Child Support Guidelines are triggered when the obligor parent's net income exceeds $10,000 per month. While Mr. Taylor's monthly income may exceed $10,000 in the month he receives the proceeds from the sale of the Shelbyville Highway property, the record contains overwhelming evidence that over time, his regular monthly income will never exceed $1,500. Thus, even taking the proceeds from the sale of the property into consideration, Mr. Taylor's average monthly income is not high enough to trigger Tenn. Comp. R.

-13-

& Regs. r. 1240-2-4-.04(3). In addition, Mr. Taylor never demonstrated that his $90-per-week child support obligation was excessive in light of his daughter's needs. Without such a showing, we would be hard pressed to fault the trial court for declining to establish an educational trust fund. *See Huntley v. Huntley*, 61 S.W.3d 329, 337 (Tenn. Ct. App. 2001).

## E.

Finally, Mr. Taylor asserts that the trial court erred by failing to provide that the funds remaining in the trial court clerk's hands on his daughter's eighteenth birthday should be returned to him. We agree because the funds being held by the clerk are intended to assure the payment of Mr. Taylor's child support obligation. Once the obligation is discharged, the funds should be returned to him. *See Price v. Price*, No. M1998-00840-COA-R3-CV, 2000 WL 192569, at * 9 (Tenn. Ct. App. Feb. 18, 2000) (No Tenn. R. App. P. 11 application filed); *Lee v. Askew*, No. 02A01-9805-JV-00133, 1999 WL 142389, at *2 (Tenn. Ct. App. Mar. 17, 1999), *perm. app. denied* (Tenn. Nov. 1, 1999); *Klemetstrud v. Klemetstrud*, No. 02A01-9306-CV-00150, 1994 WL 556365, at *5 (Tenn. Ct. App. Oct. 12, 1994), *perm. app. denied* (Tenn. June 5, 1995). Accordingly, on remand, the trial court should modify its final order to provide that any funds remaining in the hands of the trial court clerk when Mr. Taylor's child support obligation ceases shall revert to him.

## IV.

As a final matter, Ms. Taylor requests this court to award her the legal expenses she incurred on this appeal and to assess damages against Mr. Taylor pursuant to Tenn. Code Ann. § 27-1-122 (2000). We agree with the trial court's decision to require Ms. Taylor to pay her own legal expenses, and we decline to find that this appeal is frivolous.

Spouses who are required to return to court to enforce their former spouse's child support obligations may recover their legal expenses. Tenn. Code Ann. § 36-5-103(c). The purpose of permitting these awards is to protect and promote a child's right to support. Accordingly, requiring parents who frustrate child support orders to underwrite the expense of vindicating a child support order is appropriate. *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992).

While decisions regarding requests for legal expenses are discretionary, *Placencia v. Placencia*, 3 S.W.3d 497, 504 (Tenn. Ct. App. 1999), awards for these expenses incurred by a spouse to vindicate child support rights are becoming familiar and almost commonplace. *Deas v. Deas*, 774 S.W.2d 167, 170 (Tenn. 1989); *Sherrod v. Wix*, 849 S.W.2d at 785. These awards are appropriate when the parent seeking to defend or to enforce a child support obligation prevails or when requiring the prevailing spouse to pay his or her legal expenses would inequitably reduce the amount of support the child receives. *Richardson v. Richardson*, 969 S.W.2d 931, 936 (Tenn. Ct. App. 1997). A spouse who is otherwise entitled to an award for legal expenses should not be prevented from collecting them simply because he or she might be financially able to pay these fees. *Gaddy v. Gaddy*, 861 S.W.2d 236, 241 (Tenn. Ct. App. 1992).

Ms. Taylor claims that Mr. Taylor filed this appeal only to delay and to cause her expense. She seeks frivolous appeal damages pursuant to Tenn. Code Ann. 27-1-122 due to the perceived "baseless[ness]" of Mr. Taylor's appeal. In light of the changes we have made to the trial court's order, however, this appeal cannot be characterized as frivolous. Moreover, we will not award a

-14-

party attorney's fees as a punitive measure. *Derryberry v. Derryberry*, No. 03A01-9801-CV-00023, 1999 WL 486863, at * 6 (Tenn. Ct. App. July 13, 1999) (No Tenn. R. App. P. 11 application filed). Even if Mr. Taylor is "just plain mean," Ms. Taylor's income, the assets she received from the division of property, and the child support ordered to be paid to the clerk of the trial court indicates that leaving Ms. Taylor to pay her own fees will not deprive the child of the support to which she is entitled. Accordingly, we find no error in the trial court's decision to leave the parties to pay their own attorney's fees.

## V.

We affirm the trial court's judgment as modified herein and remand the case to the trial court for further proceedings consistent with this opinion. We also tax the costs of this appeal in equal proportions to Mr. Taylor and his surety and to Ms. Taylor for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE