# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 18, 2015 Session

**IN RE ESTATE OF GLENDA JOYCE PANTER HILLIS**

**Appeal from the Chancery Court for Warren County**
**No. 2775P      Larry B. Stanley, Jr., Chancellor**

———————————————

**No. M2015-00404-COA-R3-CV – Filed February 25, 2016**

———————————————

The surviving husband of the decedent challenges the validity of their 1992 antenuptial agreement and a 2010 quitclaim deed from the decedent to her son. The decedent, Glenda Joyce Panter Hillis, presented her husband with an antenupital agreement on the day before their wedding. The agreement stated that each party waived "all claims of inheritance, descent and distribution in and to the parties [sic] private and real property . . . which in any way or manner arise or accrue by virtue of said marriage . . . ." However, it did not include any financial or asset disclosures. The husband signed the agreement, and the parties married on December 30, 1992. In March of 2010, Mrs. Hillis executed a will that left her husband a car and a life estate in her real property, including some of the personal property in the marital residence, with the residue of her estate going to her son. Three months later, she executed a quitclaim deed pursuant to which she transferred a life estate in all of her real property to herself and her husband, with the remainder to her son. Mrs. Hillis died in 2012, following which her will was admitted to probate. Soon thereafter, her husband filed a petition for an elective share and a separate civil action in which he sought to invalidate the 2010 quitclaim deed as a fraudulent conveyance. The executor and Mrs. Hillis's son opposed both petitions. The son demanded a jury trial regarding the validity of the antenuptial agreement, but the trial court concluded there was no way to separate the legal and factual issues without confusing a jury and consolidated both cases for trial. Following a bench trial, the court concluded that the antenuptial agreement was invalid because it did not include the required disclosures about Mrs. Hillis's assets and because it contained contradictory provisions. As for the 2010 quitclaim deed, the court ruled that the conveyance was not fraudulent and refused to set the deed aside. All parties appeal. The son contends the court erred in denying him a jury trial. The son also contends the court erred by invalidating the antenuptial agreement. The husband contends the trial court erred by denying his petition to invalidate the 2010 quitclaim deed. We find no reversible error with the decision to deny the son's request for a jury trial. We affirm the trial court's decision to invalidate the antenuptial agreement because the agreement did not include the requisite financial and asset disclosures. We affirm the decision concerning the 2010

quitclaim deed because the evidence does not preponderate against the trial court's finding that the 2010 transfer was not fraudulent.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

William J. Butler, McMinnville, Tennessee, for the appellants, First National Bank of McMinnville and Gregory Kent Hendrixson.

Thomas Oliver Bratcher and Robert Oliver Bratcher, McMinnville, Tennessee, for the appellee, John T. Hillis.

## OPINION

Glenda Joyce Panter Hillis ("Mrs. Hillis") met John T. Hillis ("Husband") in the summer of 1990. After dating for over two years, they married in December 1992. Mrs. Hillis had one child, Gregory Kent Hendrixson ("Son"). Husband and Mrs. Hillis did not have any children together.

On December 29, 1992, the day before the wedding, Mrs. Hillis presented Husband with an antenuptial agreement that was drafted by Mrs. Hillis's attorney.[1] Significantly, the agreement does not contain any disclosures concerning the finances or assets of either party. In relevant part, the agreement states:

> Whereas each of the parties are seized and possessed of both real and personal properties in their individual rights . . . and each of the parties is desirous of retaining full and absolute control of their property and *do retain all rights* of any kind or character whether by virtue of the statute of descent and distribution or whether by statute *either party would have in the other parties* [sic] *property in the event of the death of either party*.
>
> . . .
>
> [T]he parties agree that *each shall release, remise and relinquish all claims of inheritance, descent and distribution in and to the parties* [sic] *private and real property* . . . and to the estate of the other party which in any way

---

[1] The 1992 antenuptial agreement, which consists of only two pages, reveals that the possibility of divorce was not a consideration because it does not discuss the parties' property rights in the event of a divorce – only death – giving true meaning to the phrase "until death do us part."

or manner arise or accrue by virtue of said marriage and unto the heirs and devisees and representative of each of the other party that may arise in the death of either party of this agreement.

(Emphasis added).

The agreement also expressly stated Mrs. Hillis's desire that "her son receive her real estate," with the exception of a small portion of her land that she agreed to transfer to Husband "as tenants by the entireties" upon which they would build their home. The couple moved to Mrs. Hillis's property, and Husband built a house there with Son's help; however, Mrs. Hillis never transferred any real property to Husband and herself as tenants by the entireties as promised in the antenuptial agreement. To the contrary, in 2003 Husband executed a quitclaim deed that transferred to Mrs. Hillis any interest he may have had in her real property.

Mrs. Hillis was diagnosed with cancer in early 2010, for which she had surgery. Shortly thereafter, in March 2010, she executed a will leaving Husband a car, some personal property, and a life estate in her real property. Four months later, on July 14, 2010, she executed a quitclaim deed conveying a remainder interest in her real property to Son while reserving a life estate for herself and Husband in all of her real property. The deed states that the consideration for the transfer was $10, but the notarized statement accompanying the deed states that the actual consideration received is "$0."

Mrs. Hillis's cancer returned, and she died on December 25, 2012. Her will was admitted to probate, and First National Bank of McMinnville was appointed executor. Upon learning of his meager beneficial interest under the 2010 will, Husband filed a petition for an elective share along with a separate civil action to set aside the July 2010 quitclaim deed as a fraudulent conveyance under Tenn. Code Ann. § 31-1-105.[2] Son and the executor opposed the petitions, contending that Husband had waived his right to claim an elective share in the antenuptial agreement and that the quitclaim deed was valid.

Husband moved for summary judgment regarding the validity of the antenuptial agreement and the invalidity of the July 2010 quitclaim deed. The trial court denied Husband's motion as to both issues and ruled that the two cases would be tried together. With respect to the antenuptial agreement, the court found that several factual questions existed, including "the questions of what Husband knew about [Mrs. Hillis's] property, when he knew it, and the import of his subsequent conduct . . . ." The trial court denied

---

[2] "Any conveyance made fraudulently to children or others, with an intent to defeat the surviving spouse of the surviving spouse's distributive or elective share, is, at the election of the surviving spouse, includable in the decedent's net estate . . . and voidable to the extent the other assets in the decedent's net estate are insufficient to fund and pay the elective share amount . . . ." Tenn. Code Ann. § 31-1-105.

Son's jury demand, stating that it would conduct a bench trial on all issues because there was "no way to separate [the legal] issues from the issues of fact without the likelihood of confusing a jury . . . ."

The bench trial of both actions occurred in July 2014, and Husband was the primary witness. He testified that he had begun work at a factory and eventually became a shift superintendent. As a shift superintendent, he had experience reading and signing contracts. He also testified that he first saw the antenuptial agreement on the day before the wedding at the office of Mrs. Hillis's lawyer. He stated that he executed the agreement voluntarily but did not have his own lawyer.

Husband testified that he knew Mrs. Hillis owned a car, had a "little brick home," and that "there was some land," but he did not know the value of her bank accounts, debts, or stocks and bonds. Additionally, Husband testified that he knew Mrs. Hillis and another woman owned a business together, but he did not know "the degree of partnership." He testified that he assumed Mrs. Hillis owned half of the business.

After trial, the court ruled that the antenuptial agreement was invalid even though Husband executed it voluntarily. The trial court found that the agreement contained contradictory language and did not provide an adequate disclosure of Mrs. Hillis's assets. The court also ruled that the July 2010 real estate transfer from Mrs. Hillis to Son was not fraudulent and refused to set it aside. Both Son and Husband appealed.[3]

## STANDARD OF REVIEW

In cases such as this when the action is tried without a jury, we review a trial court's factual findings de novo, accompanied by a presumption of the correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *see Boarman v. Jaynes*, 109 S.W.3d 286, 290 (Tenn. 2003). The evidence preponderates against a trial court's finding of fact when it supports another factual finding with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. *See Blair v. Brownson*, 197 S.W.3d 681, 683-84 (Tenn. 2006). Accordingly, no presumption of correctness attaches to the trial court's conclusions of law, and our review is de novo. *Id.*

---

[3] The executor of the estate, First National Bank of McMinnville, also appealed. The executor and Son are represented by the same attorney and make the same arguments on appeal. Accordingly, we will refer only to "Son" when addressing those arguments.

ANALYSIS

On appeal, Son contends that the trial court should have submitted the factual issues regarding the antenuptial agreement to a jury and that the court erred by invalidating the antenuptial agreement between Husband and Mrs. Hillis. Further, Son contends that Husband is estopped from claiming an elective share because he accepted some property under provisions of Mrs. Hillis's will. For his part, Husband contends that the July 2010 property transfer to Son was a fraudulent conveyance under Tenn. Code Ann. § 31-1-105 and should be set aside. We will address each issue in turn.

## I. Jury Trial

Son contends that the trial court erroneously denied him a jury trial with respect to the validity of the antenuptial agreement. Notably, neither Son nor Husband has argued that it was error for the trial court to conduct a bench trial on the issue of the July 2010 property transfer. Son prevailed on that issue in the trial court and thus does not appeal it. Although Husband has appealed the trial court's decision on this issue, he has not argued that it was error to try the issue without a jury. Accordingly, we will only consider whether the trial court erred by conducting a bench trial of the validity of the antenuptial agreement.

Article I, § 6 of the Tennessee Constitution states that "the right of trial by jury shall remain inviolate . . . ." Despite this language, the Tennessee Constitution does not guarantee the right to a jury trial in every case. *See Sneed v. City of Red Bank, Tenn.*, 459 S.W.3d 17, 29 (Tenn. 2014). Instead, this section preserves the right only to the extent it existed at common law "under the laws and constitution of North Carolina at the time of the adoption of the Tennessee Constitution of 1796." *Id.* at 29-30 (quoting *Helms v. Tenn. Dep't of Safety*, 987 S.W.2d 545, 547 (Tenn. 1999)). At common law, there was no right to a jury trial in matters that fell within the inherent equitable jurisdiction of chancery courts. *Smith Cnty. Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 336 (Tenn. 1984). The inherent jurisdiction of chancery courts includes the administration of estates. *Dick v. Dick*, 443 S.W.2d 472, 474 (Tenn. 1969); *Ferguson v. Moore*, 348 S.W.2d 496, 498-99 (Tenn. 1961).

Although the Tennessee Constitution does not preserve the right to jury trials in inherently equitable matters, a statutory right to jury trials in chancery court exists. The Tennessee Code provides:

> Either party to a suit in chancery is entitled, upon application, to a jury to try and determine any material fact in dispute, *save in cases involving complicated accounting, as to such accounting and those elsewhere excepted by law or by this code*, and all the issues of fact in any proper cases, shall be submitted to one (1) jury.

Tenn. Code Ann. § 21-1-103 (emphasis added); *see In re Estate of Thompson*, 952 S.W.2d 429, 432 (Tenn. Ct. App. 1997). Based on this statute, cases involving complicated accounting are exempt from the jury trial requirement. Tenn. Code Ann. § 21-1-103. In addition, our courts have held that complex and intricate cases involving mixed questions of law and fact may not be suitable for resolution by a jury. *Sasser v. Averitt Exp., Inc.*, 839 S.W.2d 422, 434 (Tenn. Ct. App. 1992) (quoting *Moore v. Mitchell*, 329 S.W.2d 821, 824 (Tenn. 1959)); *see Gibson's Suits in Chancery* § 203 (7th ed. 1988) ("[I]f the questions [of fact] are so intermixed with questions of law that they cannot be singled out, there is nothing that should be submitted to a jury and the application [for a jury trial] should be denied.").

Here, Son submitted a timely demand for a jury trial, and Husband has not argued that this case involves complicated accounting. Instead, the trial court conducted a bench trial based on the likelihood that a jury would be confused by the complexity of the mixed questions of law and fact present in the case. According to the trial court, these questions included "what Husband knew about [Mrs. Hillis's] property, when he knew it, and the import of his subsequent conduct . . . ."

Although it may be difficult to answer these questions, they are not "of such a complicated and intricate nature" that this case is inappropriate for a jury. *See Moore*, 329 S.W.2d at 824. Indeed, juries often make determinations about a party's knowledge in a variety of complex contexts. *See, e.g.*, *McWhorter v. Barre*, 132 S.W.3d 354, 365-66 (Tenn. Ct. App. 2003) (discussing whether material evidence supported the jury's finding that the defendant entertained serious doubts about the truth of his publication); *Workman v. Wal-Mart Stores East, Inc.*, M2002-00664-COA-R3-CV, 2002 WL 500988, at *4 (Tenn. Ct. App. April 4, 2002) (material evidence supported jury's finding that premises owner had constructive knowledge of a dangerous condition); *Edmondson v. Coates*, No. 01-A-01-9109-CH000324, 1992 WL 108717, at *3-4 (Tenn. Ct. App. May 22, 1992) (jury question existed concerning whether the defendants knew representations they made were false). Consequently, the difficulty of the questions in this case does not make it inappropriate for a jury. Therefore, the legal basis identified by the trial court does not justify denying Son a jury trial on this issue of the validity of the antenuptial agreement. Nevertheless, this determination does not end our inquiry concerning the propriety of denying Son's jury demand.

The right to a jury trial in chancery court extends only to "material fact[s] *in dispute* . . . ." *See* Tenn. Code Ann. § 21-1-103 (emphasis added). Accordingly, the erroneous denial of a jury trial is harmless when there are no facts in dispute or when there is no conflicting evidence on any of the material issues. *See id.*; *Elliott v. Lewis*, 463 S.W.2d 698, 701 (Tenn. 1971) ("Since the undisputed evidence sustains the holding of the court . . . the error in denying a trial by jury was not prejudicial. We are forbidden to reverse for such error."); *Hopson v. S. Am. Ins. Co.*, 618 S.W.2d 745, 746 (Tenn. Ct. App.

1980) (denial of a jury trial harmless when there was "no conflicting evidence on the material issues."). Similarly, if a party was entitled to a jury trial based on the pleadings but ultimately failed to present a jury issue, the denial of a jury trial is harmless. *See Transouth Mortg. Corp. v. Keith*, 1985 WL 4677, at *2 (Tenn. Ct. App. Dec. 24, 1985) ("Even if defendant were entitled to a jury under the pleadings but then failed to make out a jury issue, what harmful error would be committed by a denial of a jury at the outset?").

Here, the relevant factual issues relate to the circumstances surrounding Husband's decision to sign the antenuptial agreement, including his knowledge of Mrs. Hillis's assets at that time. There is no disputed evidence concerning these issues. Both Mrs. Hillis and the attorney who drafted the antenuptial agreement are dead, and Husband was the only witness who testified about his knowledge of Mrs. Hillis's assets. Husband testified that he entered the agreement voluntarily on the day before the wedding without the advice of an independent lawyer. He stated that he knew that Mrs. Hillis owned a car, some land, and part of a business. He also stated that he did not know the value of her bank accounts, investments, or business interest. No other evidence contradicted this testimony.

Son contends that Husband's credibility creates a question for a jury to resolve. He argues that Husband's testimony was contradictory and that he was impeached or made additional admissions on cross-examination. Based on our review of the record, Husband's testimony appears largely consistent, and Son has not identified any additional evidence that contradicts Husband's testimony about his knowledge of Mrs. Hillis's assets.

The foregoing notwithstanding, the credibility of an interested witness may present an issue for a jury even if the witness's testimony has not been impeached or contradicted. *See Jennings v. Case*, 10 S.W.3d 625, 633 n.4 (Tenn. Ct. App. 1999); *Price v. Allstate Ins. Co.*, 614 S.W.2d 377, 379 (Tenn. Ct. App. 1981); *Poole v. First Nat. Bank of Smyrna*, 196 S.W.2d 563, 568 (Tenn. Ct. App. 1946). Under this rule, "once the plaintiff makes out a *prima facie* case, the testimony of a party to the suit who has an interest in the outcome of the case presents a jury question even if it is uncontradicted, unimpeached, and not discredited." *Anderson v. Mason*, 141 S.W.3d 634, 637 (Tenn. Ct. App. 2003). Importantly, this rule does not convert the denials of interested witnesses, standing alone, into "affirmative evidence for the plaintiff . . . ." *Morris v. Columbia Const. Co., Inc.*, 109 S.W.3d 314, 317 (Tenn. Ct. App. 2003). Plaintiffs cannot carry the burden to establish their cases by pointing only to the testimony of an interested witness. *See id.* As a result, the fact that an interested witness has presented uncontradicted testimony, without more, will not create a dispute of fact for a jury. *See id.*

Although Husband is clearly interested in the outcome of this case, this fact does not create an issue for a jury unless it is coupled with other evidence. *See id.*; *Anderson*, 141 S.W.3d at 637. Son has not produced any such evidence. Therefore, Husband's

interest in the outcome of this litigation, without more, is not sufficient to create an issue for a jury. *See Morris*, 109 S.W.3d at 317.

Based on the foregoing, we affirm the trial court's decision to deny Son's request for a jury trial, although on different grounds. *See City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 60 n.18 (Tenn. Ct. App. 2004) ("The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result.").

## II. The Antenuptial Agreement

The trial court found that the antenuptial agreement was invalid because it was contradictory and because Husband did not enter it knowledgeably. After examining the agreement, we have concluded that it is not contradictory as to render it void. However, the evidence does not preponderate against the trial court's finding that Husband did not enter the agreement with the requisite knowledge of Mrs. Hillis's assets. Accordingly, we affirm the trial court's ruling that the antenuptial agreement is unenforceable.

### A. Inconsistencies Between Recitals and Operative Provisions

Antenuptial agreements are interpreted using the principles of construction that apply to other written instruments. *Reed v. Reed*, No. M2003-02428-COA-R3-CV, 2004 WL 3044904, at *6 (Tenn. Ct. App. Dec. 30, 2004). Moreover, because antenuptial agreements are favored by public policy, they must be construed liberally to give effect to the intention of the parties. *Id.* (citing *Sanders v. Sanders*, 288 S.W.2d 473, 477 (Tenn. Ct. App. 1955)). As this court has previously stated:

> In general, the provisions of a contract must be examined in the context of the entire agreement. Contractual terms should be given their plain, ordinary meaning and should be construed harmoniously to give effect to all provisions and to avoid creating internal conflicts. With respect to antenuptial agreements, the substance of the parties' intent will prevail over the form of the instrument, and the agreement will not be held invalid for technical or trifling reasons.

*Id.* (internal citations and quotation marks omitted).

Contracts may include clauses called "recitals," which are "preliminary statement[s] in a contract or deed explaining the reasons for entering into it or the background of the transaction, or showing the existence of particular facts." Black's Law Dictionary 1084 (9th ed. 2010). "Traditionally, each recital begins with the word *whereas*." *Id.*

Because the purpose and function of recitals is to provide background information about the parties and their reasons for entering the contract, recitals are not part of the operative, binding portion of the contract. *See S.M. Williamson & Co. v. Ragsdale*, 95 S.W.2d 922, 924-25 (Tenn. 1936); 17A Am. Jur. 2d *Contracts* § 383. At issue in *S.M. Williamson* was the validity of a guaranty contract signed by several individuals. *See S.M. Williamson & Co.*, 95 S.W.2d at 923-24. The contract contained a recital stating "[w]hereas S.M. Williamson and Company, Incorporated, *have sold* to third parties a series of Fifty-seven (57) notes . . . ." *Id.* at 923 (emphasis added). The individual guarantors sought to avoid the contract by arguing that the words "have sold" in the recital indicated that the contract was invalid because it was based on past consideration, which is insufficient to support a contract. *See id.* at 924. The Supreme Court rejected this argument, holding that "[t]he words 'have sold' are no part of the consideration of the contract, but considered with their proper context are merely descriptive of the transaction by reason of which the contract of guaranty was executed." *Id.* at 924-25.

Subsequently, our courts have held that recitals "may have a material influence" when construing a contract and should, if possible, be reconciled with the operative provisions of the contract and given effect. *King v. Tubb*, No. 88-273-II, 1989 WL 5446, at *3 (Tenn. Ct. App. Jan. 27, 1989) (quoting 17 Am. Jur. 2d *Contracts* § 268 (1964)); *see McClendon v. Crowder*, No. 03A01-9703-CV-00083, 1997 WL 412120, at *3 n.4 (Tenn. Ct. App. July 24, 1997). Thus, if the recitals in a contract are clear and the operative part is ambiguous, the recitals govern the contract's construction. *King*, 1989 WL 5446, at *3; *see* 17A Am. Jur. 2d *Contracts* § 383. However, "[i]f both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part must control." 17A Am. Jur. 2d *Contracts* § 383 (footnote omitted).[4]

---

[4] Courts in many other jurisdictions distinguish between recitals and operative provisions when interpreting contracts. *See All Metals Fabricating, Inc. v. Ramer Concrete, Inc.*, 338 S.W.3d 557, 561 (Tex. App. 2009) (recitals will not control the operative provisions of a contract unless those provisions are ambiguous); *Jones Apparel Grp., Inc. v. Polo Ralph Lauren Corp.*, 16 A.D.3d 279, 791 N.Y.S.2d 409, 410 (1st Dep't 2005) ("Since the contract is unambiguous on its face, there is no need to refer to its recitals, which are not part of the operative agreement . . . ."); *Demorias v. Wisniowski*, 841 A.2d 226, 236 (Conn. App. Ct. 2004) (noting that "whereas" clauses are explanations of the circumstances surrounding the execution of the contract); *Johnson v. Johnson*, 725 So.2d 1209, 1212-13 (Fla. Dist. Ct. App. 1999) ("[W]e do not agree that the prefatory recitations contained in the various 'whereas' clauses are binding, operative provisions to this otherwise unambiguous contract."); *Fugate v. Town of Payson*, 791 P.2d 1092, 1093-94 (Ariz. Ct. App. 1990) (operative provisions of a contract prevail when both operative provisions and recitals are clear but inconsistent); *accord Cain Rest. Co. v. Carrols Corp*, 273 Fed. App'x 430, 434 (6th Cir. 2008) ("In light of a preamble's purpose in a contract, we recognize that provisions in a preamble, like recitals or other prefatory provisions of a contract, do not necessarily control over provisions in the operative sections."); *U.S. v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (Sotomayor, J.) ("[C]ontracts may, and frequently do, include recitals of the purposes and motives of the contracting parties, which may shed light on, but are distinct from, the contract's operative promises to perform.").

Although inartfully drafted, the recitals here do not contradict the operative terms of the agreement.[5] Instead, the whereas clause in question describes the reasons the parties entered this agreement. As the recitals indicate, the parties desired to preserve their autonomy but they also possessed – i.e. retained – certain rights to inherit the other party's property that would take effect when they married. In order to maintain their autonomy, Husband and Mrs. Hillis had to relinquish these rights, which they did in the operative clauses of the antenuptial agreement. Thus, when viewed as a whole the entire agreement indicates the parties' desire to maintain control over their respective assets and to relinquish their right to inherit the other's property.

Moreover, to the extent the agreement contains a contradiction or inconsistency, the operative provisions must prevail over the recitals. *See S.M. Williamson & Co.*, 95 S.W.2d at 924-25; 17A Am. Jur. 2d *Contracts* § 383. Recitals only prevail if the operative provisions of the agreement are ambiguous. *See Mclendon*, 1997 WL 412120, at *3 n.4; *King*, 1989 WL 5446, at *3; 17A Am. Jur. 2d *Contracts* § 383. Here, the operative portion of the antenuptial agreement is clear: the parties agreed to relinquish their rights to inherit the other party's property. Accordingly, to the extent there is an inconsistency, the operative provision that relinquishes rights prevails over the recital provision. *See* 17A Am. Jur. 2d *Contracts* § 383. As a result, this agreement was not invalid based on inconsistency between its recitals and operative provisions.

### B. Full and Fair Disclosure of Assets

Although the agreement is not void because of a contradiction, it is unenforceable because Husband did not enter it knowledgably.

In Tennessee, antenuptial agreements are binding if they are entered into "freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse." Tenn. Code Ann. § 36-3-501. Antenuptial agreements must meet this standard whether they are construed in the probate context or the martial dissolution context. *See In re Estate of Davis*, 184 S.W.3d 231, 237 (Tenn. Ct. App. 2004). "The courts of Tennessee, moreover, have applied the standard with the same rigor in both the

---

[5] At least two cases in Tennessee have involved antenuptial agreements with language similar to the agreement in this case. *See In re Estate of Davis*, 213 S.W.3d 288, 291 (Tenn. Ct. App. 2006); *In re Estate of Baker v. King*, 207 S.W.3d 254, 257-58 (Tenn. Ct. App. 2006). Notably, the agreements in those cases recite that the relevant parties desire to relinquish their rights rather than retain them. *See In re Estate of Davis*, 213 S.W.3d at 291 ("WHEREAS . . . each of said parties is desirous of retaining absolute and full control of their said property . . . and of *relinquishing* all rights of every kind or character . . . ." (emphasis added)); *In re Estate of Baker*, 207 S.W.3d at 257 ("WHEREAS . . . each of said parties is desirous of retaining absolute and full control of their said properties . . . and of *relinquishing* all rights of every kind and character whether by virtue of their marriage to each other, of descent and distribution . . . and all other rights of every kind and character arising from their said marriage in the property of the other." (emphasis added)).

- 10 -

probate and dissolution contexts." *Id.* at 237-38 (citing *In Re Estate of Miller*, C.A. No. 88-316-II, 1989 WL 19921, at *2 (Tenn. Ct. App. March 8, 1989)). In order to enforce an antenuptial agreement, the proponent of the agreement must prove that the agreement meets the statutory requirements by a preponderance of the evidence. *See Randolph v. Randolph*, 937 S.W.2d 815, 821 (Tenn. 1996).

There are two ways to demonstrate that an antenuptial agreement was entered knowledgably. First, proponents of the agreement can show that the spouse seeking to avoid the agreement was provided with "a full and fair disclosure of the nature, extent and value of [the other spouse's] holdings . . . ." *Id.* at 817. Second, in the absence of sufficient disclosure, the agreement may still be enforceable if the proponent demonstrates that "disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings." *Id.* Here, it is undisputed that Husband was not provided with any disclosures of Mrs. Hillis's holdings when he executed the antenuptial agreement. Accordingly, the agreement can only be binding if such disclosures were unnecessary because Husband had sufficient independent knowledge of Mrs. Hillis's holdings. *See id.* at 817, 822.

Whether one spouse had sufficient knowledge of the other spouse's holdings depends upon the particular facts and circumstances of each case. *See id.* at 822. Relevant factors include:

> the parties' respective sophistication and experience in business affairs, the duration of the relationship prior to the execution of the agreement, the time of the signing of the agreement in relation to the time of the wedding, and the parties' representation by, or opportunity to consult with, independent counsel.

*Id.* Although the "participation of independent counsel representing each party is not the sine qua non of enforceability, it provides the best assurance that the legal prerequisites will be met and that the antenuptial agreement will be found enforceable in the future." *In re Estate of Baker v. King*, 207 S.W.3d 254, 267 (Tenn. Ct. App. 2006) (citing *Randolph*, 937 S.W.2d at 822).

Tennessee law does not require that a spouse have knowledge "of the specific appraised values of the other spouse's assets, [but] knowledge of the [other] spouse's overall net worth is necessary." *Id.* at 270. Accordingly, being "aware of the nature" of the other spouse's business affairs and having "general knowledge" of his or her financial assets are insufficient to meet this requirement. *See id.*; *Baker v. Baker*, 142 S.W.2d 737, 746 (Tenn. Ct. App. 1940) ("[T]he fact that the intended [spouse] knows in a general way that the [other spouse] is reputed to be wealthy is not sufficient to satisfy the requirement of a full disclosure in making antenuptial contracts."). This court has upheld antenuptial agreements when a proponent-spouse's assets are "visible and easily comprehensible, and

- 11 -

it is shown that the other spouse could clearly see the fully extent, nature, and value of the holdings . . . ." *Ellis v. Ellis*, No. E2013-02408-COA-R9-CV, 2014 WL 6662466, at *7 (Tenn. Ct. App. Nov. 25, 2014), *perm. app. denied* (Tenn. Mar. 12, 2015). In contrast, this court will invalidate antenuptial agreements when "the extent and value of the proponent spouse's assets were not easily comprehensible or ascertainable." *Id.*

Here, both the circumstances surrounding the execution of the antenuptial agreement and Husband's general knowledge of Mrs. Hillis's assets support the finding that the agreement was not entered knowledgably. Son emphasizes that Husband was a shift superintendent with experience reading and signing contracts. Husband is intelligent, has some experience with business affairs, and entered this agreement voluntarily; however, the undisputed evidence at trial was that Husband first saw this agreement one day before the wedding and that he did not have the independent advice of counsel. Son argues that Husband knew and "was comfortable with" the attorney who drafted the agreement, but comfort and familiarity are not what the statute requires. Instead, the relevant inquiry is whether Husband had opportunity to consult with independent counsel, *see Randolph*, 937 S.W.2d at 822, and the attorney who was employed by Mrs. Hillis to draft the antenuptial agreement was certainly not independent in this situation.

Further, Husband did not have sufficient knowledge of Mrs. Hillis's holdings. Husband testified that he was aware that Mrs. Hillis had greater earning capacity than he did, but this kind of general knowledge hardly satisfies the statutory requirement that agreements be entered knowledgably. *See In re Estate of Baker*, 207 S.W.3d at 270. Son notes that Husband dated Mrs. Hillis for over two years and knew that she owned a car, some real state, and some personal property. But even if Husband could see the extent of Mrs. Hillis's "visible and easily comprehensible assets" after two-and-a-half years of dating, *see Ellis*, 2014 WL 6662466, at *7, it is undisputed that he knew very little about her other assets, such as bank accounts and investments. *See id.*

In addition, although Husband correctly assumed that Mrs. Hillis owned half of a business, he did not know the value of that interest or of the business as a whole. Mrs. Hillis's business interest alone accounts for nearly 40% of her net estate.[6] There is no evidence to support a finding that husband knew the extent or value of her business interest, bank accounts, and investments, which were significant, when he signed the agreement. Therefore, there is no factual foundation upon which to conclude that Husband had knowledge the "full nature, extent, and value" of Mrs. Hillis's holdings. *See Randolph*, 937 S.W.2d at 817, 822.

---

[6] Although the real estate that was conveyed in 2010 is estimated to represent only 22% of her assets at the time, if the real estate was included in the value of Mrs. Hillis's estate at the time of her death, the value of her entire estate would have been approximately $1.3 million.

Based on the foregoing, the evidence does not preponderate against the trial court's finding that, in 1992, Husband did not enter the agreement knowledgably. Accordingly, we affirm the trial court's conclusion that the antenuptial agreement was unenforceable.[7]

### III. The Doctrine of Election

Son contends that Husband is estopped from claiming an elective share because he accepted property under the will.

In Tennessee, the doctrine of election prevents parties from claiming inconsistent rights with respect to the same subject. *See Standefer v. Standefer*, No. 03A01-9209-CH-00328, 1993 WL 6548, at *2-3 (Tenn. Ct. App. Jan. 15, 1993) (quoting *Elmore v. Covington*, 172 S.W.2d 809, 811 (Tenn. 1943)). Under this doctrine, surviving spouses are prohibited from claiming an elective share if they have accepted benefits under a decedent spouse's will. *In re Estate of Davis*, M2012-00559-COA-R3-CV, 2013 WL 5827640, at * 7 (Tenn. Ct. App. Oct. 28, 2013), *perm. app. denied* (Tenn. Mar. 4, 2014). Surviving spouses cannot "take any beneficial interest in a will, and at the same time set up any right or claim . . . which shall defeat, or in any way prevent, the full effect and operation of every part of the will . . . ." *In re Estate of Sanderson*, No. W2001-01928-COA-R3-CV, 2002 WL 31423847, at *4 (Tenn. Ct. App. Oct. 28, 2002) (quoting *Williams v. Williams*, 83 Tenn. 438, 445 (1885)). Accordingly, surviving spouses are required to "either accept a benefit under a will and adopt the whole contents of the instrument, conforming to all its provisions, or renounce the will and exercise rights inconsistent with the testator's intent." *In re Estate of Grass*, No. M2005-00641-COA-R3-CV, 2008 WL 2343068, at *11 (Tenn. Ct. App. June 4, 2008) (citing *Colvert v. Wood,* 25 S.W. 963, 965 (Tenn. 1894)). Election must be made by a direct and unequivocal act. *Barnes v. Walker*, 234 S.W.2d 648, 650 (Tenn. 1950) ("[A]n election is made by the adoption, by an unequivocal act, of one of the two existing remedies." (internal quotation marks omitted)); *O'Bryan v. Glenn*, 17 S.W. 1030, 1031 (Tenn. 1892) ("The question is, has an election been made by a direct and unequivocal act?"); *Allied Sound, Inc. v. Neely*, 909 S.W.2d 815, 822 (Tenn. Ct. App. 1995) ("The plaintiff must unequivocally choose one remedy and is thereafter estopped to resort to the other remedy.").

Husband filed his petition for an elective share in April 2013, four months after his wife's death, and never withdrew it. *See* Tenn. Code Ann. § 31-4-102(c) ("The surviving spouse may withdraw a demand for an elective share at any time before entry of a final

---

[7] The trial court also determined that the antenuptial agreement was invalid because Mrs. Hillis never transferred a portion of her real property to Husband as provided by the agreement. Based on our conclusion that the agreement is unenforceable because Husband did not enter it knowledgably, we need not address this issue.

- 13 -

determination by the court."). Son notes that, after Husband filed his petition, the trial court extended the time for Husband to claim an elective share by one year. *See* Tenn. Code Ann. § 31-4-102(a)(2). Although Son does not challenge the trial court's decision to extend the time for making an election, he argues that Husband's petition "had essentially been withdrawn when he was granted further time in which to decide whether he wished to do so at all." (Emphasis omitted). Son has not cited any authority for this proposition, and our research has revealed none. Consequently, the record indicates that Husband has consistently pursued his claim of an elective share.

Son cites portions of Husband's testimony that, according to him, demonstrate that Husband is claiming or has claimed property under the will. This testimony, when considered in context, merely addresses Husband's understanding of what the will bequeathed to him, not what he elected to take. Expressing an understanding of what a will provides is not the same as a "direct and unequivocal" act indicating an election to take under the will. *See Barnes*, 234 S.W.2d at 650; *O'Bryan*, 17 S.W. at 1031.

Son also argues that Husband cannot claim an elective share because he accepted benefits under the will. According to Son, Husband received benefits under the will because he had "already taken possession of [some of Mrs. Hillis's personal property] . . . *before* electing against the estate." (Emphasis in original). This sentence, however, is not accompanied by a citation to the record as Tenn. R. App. P. 27(a)(7)(A) requires and we find no evidence to support a finding that Husband "took possession of this property." Following Mrs. Hillis's death, Husband simply remained in the marital home, in which he had a life estate and where the personal property at issue remained following her death. Thus, Husband did not "take" personal property belonging to the estate; he merely allowed it to remain where it had been for years. Based on these facts, it is disingenuous for Son to contend that Husband took "direct and unequivocal action" that constitutes an election to take personal property under the will. *See Barnes*, 234 S.W.2d at 650; *O'Bryan*, 17 S.W. at 1031.

Based on the foregoing, we have concluded that Husband did not assert any rights under the will or accept any benefits under it. Accordingly, he is not estopped from claiming an elective share.

### IV. The 2010 Quitclaim Deed

Husband contends that the trial court erred when it found that the 2010 quitclaim deed did not constitute a fraudulent conveyance

The Tennessee Code provides:

Any conveyance made fraudulently to children or others, with an intent to defeat the surviving spouse of the surviving spouse's distributive or elective

share, is, at the election of the surviving spouse, includable in the decedent's net estate under § 31-4-101(b), and voidable to the extent the other assets in the decedent's net estate are insufficient to fund and pay the elective share amount payable to the surviving spouse under § 31-4-101(c).

Tenn. Code Ann. § 31-1-105.

The gravamen of a claim under this statute is "whether the decedent spouse intended to practice fraud on the surviving spouse." *Simpson v. Fowler*, No. W2011-02112-COA-R3-CV, 2012 WL 3675321, at *5 (Tenn. Ct. App. Aug. 28, 2012). When determining whether a conveyance was made with fraudulent intent, this court will consider:

> (1) the consideration given for the transfer, (2) the size of the transfer in relation to the decedent's total estate, (3) the time between the transfer and the transferor's death, (4) the relations which existed between the spouses at the time of the transfer, (5) the source from which the property came, (6) whether the transfer was illusory, and (7) whether the surviving spouse was adequately provided for in the will.

*Id.* (citing *Finley v. Finley*, 726 S.W.2d 923, 924 (Tenn. Ct. App. 1986)). "Circumstances which establish fraudulent intent are as varied as the ingenuity of the human mind may devise." *Warren v. Compton*, 626 S.W.2d 12, 17 (Tenn. Ct. App. 1981). Accordingly, our analysis is not limited to the above-listed factors, and we will consider all the facts and circumstances surrounding the transfer. *See id.*; *Simpson*, 2012 WL 3675321, at *5.

In addition to the above-listed factors, Husband contends the 2010 quitclaim was a fraudulent transfer because Mrs. Hillis kept the deed and transfer of her real property a secret from him. Although the secrecy of a real property transfer can be significant depending on the totality of circumstances, it is not significant here. Instead, after reviewing the circumstances of this transfer, we have determined that the evidence supports the trial court's finding that the 2010 quitclaim deed was not a fraudulent conveyance. The consideration for the 2010 transfer was nonexistent or nominal, but the transfer itself was not illusory. Mrs. Hillis acquired the real property before her marriage to Husband and was its sole owner at all relevant times. The real property represented only 22% of her estate, the transfer was made more than two years prior to her death, the relations between she and Husband were good at all relevant times, and Husband was provided a life estate in the real property under the 2010 quitclaim deed and her will.

Based on the foregoing, we affirm the trial court's finding that the transfer of Mrs. Hillis's real property pursuant to the 2010 quitclaim deed was not a fraudulent conveyance.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with the costs of appeal assessed equally against John T. Hillis and Gregory Kent Hendrixson.

_____
FRANK G. CLEMENT, JR., JUDGE